645 A.2d 734

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
ANTHONY DIFRISCO, DEFENDANT–APPELLANT.

Argued May 3, 1994—Decided July 27, 1994.

436

438

440

*Paul M. Klein,* Deputy Public Defender II, and *M. Virginia Barta,* Assistant Deputy Public Defender, argued the cause for appellant *(Susan L. Reisner,* Acting Public Defender, attorney).

*Hilary L. Brunell,* Assistant Prosecutor, argued the cause for respondent *(Clifford J. Minor,* Essex County Prosecutor, attorney).

. *Catherine A. Foddai,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey *(Deborah T. Poritz,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

In *State v. Di Frisco,* 118 *N.J.* 253, 283, 571 *A.2d* 914 (1990) [*Di Frisco* I], we affirmed Anthony DiFrisco's conviction for the murder of Edward Potcher but vacated his death sentence and remanded the case for a new penalty-phase hearing. At the second penalty-phase proceeding, the jury returned a death-penalty verdict, and the trial court sentenced defendant to death. Defendant appeals directly to this Court as of right. *R.* 2:2–1(a)(3). We affirm the imposition of the death penalty.

## *I. FACTS AND PROCEDURAL HISTORY*

The facts of this case are discussed in detail in *Di Frisco* I, 118 *N.J.* at 255–60, 571 *A.2d* 914. We recite only the facts relevant to this appeal.

## A. DiFrisco I

On August 12, 1986, Edward Potcher, the owner of Jack's Pizzeria in Maplewood, was killed when an assailant shot him at close range four times in the head and once in the body. Through March 1987, the police had no leads in solving this cold-blooded, execution-style killing.

On April 1, 1987, defendant was arrested in New York for various traffic violations, car theft, and reckless endangerment. Believing that he would be better served by implicating a "higher-up" in a murder, defendant confessed to the New York City police that a man named Anthony Franciotti had paid him $2,500 to kill a pizzeria owner in New Jersey.

> At first incredulous of the defendant's story, the New York police officer asked defendant for details. Defendant did not know where the crime had taken place, nor even the name of the victim. He did know that it involved a pizzeria in New Jersey.
>
> He said that Franciotti had paid him to do the killing because the pizza-shop owner was about to inform on Franciotti. He said that Franciotti drove him there on the day of the murder. DiFrisco stated that he entered the pizzeria alone and Franciotti waited in the car while the crime took place.
>
> Bit by bit, the New York police closed in on the case. They called New Jersey authorities. They found an unsolved murder in Maplewood, Essex County, fitting the description of the murder in respect of time and place. The last links were the details furnished by the defendant that there were five shots from a .32 caliber automatic gun, that a silencer was used, and that the store sold only whole pizza pies, not slices.
>
> Within hours, the Maplewood Police and Essex County homicide officers arrived at the precinct house in the Bronx. Defendant repeated the story to them and signed a confession to the murder implicating Franciotti. Several days later, while in police custody in New Jersey, defendant was to call Franciotti to link him to the murder. The police intended to tape that conversation. Defendant had consulted with a public defender, who advised him to make the call. At the last moment, defendant refused to call Franciotti. He said that his father counseled against further cooperation with the police without the advice of paid counsel.
>
> [Di Frisco I, supra, 118 N.J. at 258–59, 571 A.2d 914.]

An Essex County Grand Jury subsequently indicted defendant for the capital murder of Edward Potcher. The State noted three aggravating factors: "outrageously or wantonly vile" murder, N.J.S.A. 2C:11–3c(4)(c); murder for hire, N.J.S.A. 2C:11–3c(4)(d); and murder to escape the detection of another crime, N.J.S.A.

2C:11–3c(4)(f). On January 11, 1988, defendant pled guilty to capital murder, repeating the essence of his confession and responding "Yes" when asked, "And was it your intention to kill him at that time?"

Pursuant to *N.J.S.A.* 2C:11–3c(1), defendant waived a jury for the penalty phase of his trial.

The trial court found that two aggravating factors had been proven: that defendant was a hired killer, *N.J.S.A.* 2C:11–3c(4)(d), and one was killed to avoid the detection of another, *N.J.S.A.* 2C:11–3c(4)(f). Although the court made no specific finding, it ruled that the c(4)c factor "was encompassed in the commission of the murder for a consideration." The trial court also found one mitigating factor, that "[t]he defendant rendered substantial assistance to the state in the prosecution of another person for the crime of murder [*N.J.S.A.* 2C:11–3c(5)(g).]" It found that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt. The trial court sentenced the defendant to death. The trial court later denied defendant's motion for a new trial.

[*Id.* at 259, 571 *A.*2d 914.]

We affirmed defendant's guilt-phase conviction, but reversed his death sentence and remanded for a new sentencing proceeding. *Id.* at 283, 571 *A.*2d 914. After *Di Frisco* I but prior to the new penalty-phase hearing, defendant twice moved to withdraw his guilty plea. The trial court denied both motions.

## B. Second Penalty–Phase Proceeding

Defendant initially moved for a directed life verdict, but the trial court denied the motion. At the penalty-phase remand the State alleged two aggravating factors: that the murder had been committed both for payment and to escape detection for another crime. In mitigation, defendant asserted that he had been under the influence of extreme mental or emotional disturbance, *N.J.S.A.* 2C:11–3c(5)(a); that his capacity to appreciate the wrongfulness of his conduct had been significantly impaired as a result of mental disease or defect or intoxication, *N.J.S.A.* 2C:11–3c(5)(d); that he had rendered substantial assistance to the State in the prosecution of another person for the crime of murder, *N.J.S.A.* 2C:11–3c(5)(g); and any other factor relevant to defendant's character, record, or circumstances of the offense (the "catch-all" factor),

*N.J.S.A.* 2C:11–3c(5)(h). Under the catch-all factor, defendant listed thirteen different circumstances he believed were mitigating.

The jury unanimously found as an aggravating factor that defendant had committed the murder for payment, but only eleven jurors found the second aggravating factor, that defendant had committed the murder to avoid detection for another crime. Hence, the jury rejected that factor. At least one juror found thirteen of the mitigating factors presented. The jury concluded that the unanimously-found aggravating factor outweighed all the mitigating factors beyond a reasonable doubt. In conformance with the jury verdict, the trial court sentenced defendant to death. Two weeks later, the trial court denied defendant's motion to set aside the death sentence in favor of a life sentence.

In this appeal, defendant sets forth a number of reasons why his death sentence should be reversed. We address the most significant issues in chronological order.

## II. DEFENDANT'S GUILTY PLEA

Prior to the second penalty-phase hearing, defendant made two motions to withdraw his guilty plea. He initially argued that his plea was not a knowing and voluntary waiver of his right to trial. After conducting a hearing, the trial court found defendant's testimony in support of that claim "to be utterly incredible." Thus, the trial court denied the motion. Defendant subsequently moved to withdraw his plea on the ground that the plea had resulted from ineffective assistance of counsel. The trial court once again denied the motion.

The crux of defendant's argument in both motions was that his attorney had so grossly misinformed him of the potential of a death sentence that he had entered his plea without understanding the charge and knowing the consequences of that plea.

## A. Voluntary and Knowing Plea

Although defendant recognizes that his "[s]olemn declarations in open court carry a strong presumption of verity," *Blackledge v. Allison*, 431 *U.S.* 63, 74, 97 *S.Ct.* 1621, 1629, 52 *L.Ed.*2d 136, 147 (1977), he maintains that he believed that his open-court guilty plea and waiver of right to a trial were mere "formalities" necessary to secure a life sentence. Although we upheld the validity of the plea in *Di Frisco* I, defendant argues that we should now vacate the plea because he rendered it without a clear understanding of the penal implications associated with it.

Defendant's argument tracks our consistently-held position that the "touchstone of any guilty plea is that it is voluntarily made by the defendant with an understanding of the nature of the charge as well as the consequences of the plea, and that there is a factual basis to support the plea of guilty for the crime or crimes." *State v. Warren*, 115 *N.J.* 433, 442–43, 558 *A.*2d 1312 (1989); *see also R.* 3:9–2 (stating that trial court must be satisfied that defendant's "plea is made voluntarily ... and with an understanding of the nature of the charge and the consequences of the plea").

More specifically, defendant relies on our decision in *State v. Kiett*, 121 *N.J.* 483, 582 *A.*2d 630 (1990), in which we held that a juvenile who had pled guilty to capital murder believing his plea was the only way to avoid a death sentence could withdraw his plea because the plea had been based on the mistaken belief that a juvenile could be sentenced to death under the capital-punishment statute. *Id.* at 491, 582 *A.*2d 630; *see State v. Bey*, 112 *N.J.* 45, 98, 548 *A.*2d 846 (1988) (holding that juveniles are not death eligible under capital-punishment statute).

*Kiett*, however, is distinguishable because of the nature of the alleged misinformation involved. In *Kiett*, we reasoned that "[i]f a defendant is misinformed about his or her eligibility for the death sentence, and if that misunderstanding is material to the plea, he or she cannot be deemed to have entered a guilty plea with a full understanding of the penal consequences." 121 *N.J.* at 489, 582 *A.*2d 630. Here, DiFrisco was allegedly misinformed regarding

the likelihood of the imposition of a death sentence. The alleged misinformation in *Kiett* concerned a concrete legal fact—namely, Kiett's counsel had told him that he was death eligible, even though he was not. The alleged misinformation in this case concerns a legal opinion: defendant's counsel told defendant that in his opinion the court would not enter a death sentence on the guilty plea.

For defendant to prevail he must show that he did not understand that a death sentence was a possible consequence of pleading guilty and that his lack of understanding was a material factor in his decision to plead. DiFrisco has failed to demonstrate that he was unaware of the nature and consequences of his plea.

Defendant appeared before the trial court to enter a guilty plea to the indictment. At the outset of the proceeding, the assistant prosecutor explained that defendant would plead guilty and that with the consent of the State, the penalty-phase hearing would be held before the court. However, the prosecutor emphasized that "[t]he State will still be proceeding with aggravating evidence and the State will still continue to actively seek the death penalty."

At that point, the court directed questions to defendant. It set forth the charges contained in the indictment and asked defendant whether defense counsel had reviewed the charges with him. Defendant answered that he understood the charges and had reviewed them with his counsel. The court then focused on the consequences of defendant's action in entering a guilty plea:

> THE COURT: And do you understand that the maximum sentence on count one can either be from thirty years to life, without parole for thirty years, or the imposition of the death penalty upon you? Do you understand that?
> THE DEFENDANT: Yes, sir.

The court then described the rights defendant had waived by entering a guilty plea and ascertained that defendant understood those rights. Then the court addressed the potential sentence that defendant faced:

> THE COURT: Now, do you understand that although you are entering a plea of guilty to murder, ... that there has to be another hearing to decide what the sentence shall be?

THE DEFENDANT: Yes, sir.

THE COURT: And do you further understand that if this Court should find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors, that this Court could impose the death penalty.

THE DEFENDANT: Yes, sir.

\* \* \* \* \* \* \* \*

THE COURT: You have thought this over carefully?

THE DEFENDANT: Yes, sir.

THE COURT: And you still wish to plead guilty?

THE DEFENDANT: Yes, sir.

The court then elicited from defendant that no promises had been made by the prosecutor or any other person to induce a guilty plea and that no threats or coercion were employed to induce the plea. Finally, the court showed defendant the LR–27 form, which defendant stated he had reviewed with his defense counsel and had understood. That form clearly set forth that entering the guilty plea did not preclude the court from imposing a death sentence from being imposed.

Prior to the second penalty-phase hearing, the court held a hearing on DiFrisco's motion to withdraw his plea. Both defendant and his former attorney, Samuel DeLuca, Esq., testified at the hearing. At the conclusion of the hearing, the trial court found DiFrisco's testimony to be "utterly incredible." According to the trial judge,

Although I believe that the defense counsel's opinion expressed to his client was that death was not a likely verdict, and that he firmly conveyed that opinion to the defendant, I'm equally satisfied that defense counsel understood and that the defendant knew that a death sentence was possible as he, the defendant, acknowledged to the trial court when he pled guilty.

■ The factual findings of the trial court need be supported only by sufficient credible evidence. *State v. Johnson,* 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964). Considering the following evidence, we agree with the trial court's factual finding that defendant did understand the nature and consequences of his plea.

(1) Defendant signed forms and acknowledged in open court that he understood he could receive the death penalty;

(2) Defendant admitted that the court told him that he was subject to the death penalty as did both the public defender who had represented him briefly and an assistant prosecutor who had told him that death was a "realistic possibility";

(3) DeLuca testified that he had never told DiFrisco that he absolutely would not receive the death penalty;

(4) DeLuca testified that he had told DiFrisco that he "never thought for a second" that the court would impose the death penalty. That view, however, was expressed as an opinion, not as a promise or guarantee.

■ In addition, the erroneous sentencing prediction of a defense counsel does not warrant vacating a guilty plea rendered because of it. *Wellnitz v. Page,* 420 *F.*2d 935 (10th Cir.1970); *accord United States v. Garcia,* 909 *F.*2d 1346 (9th Cir.1990); *Little v. Allsbrook,* 731 *F.*2d 238, 241 (4th Cir.1984); *United States v. Hollis,* 718 *F.*2d 277, 280–81 (8th Cir.1983), *cert. denied,* 465 *U.S.* 1036, 104 *S.Ct.* 1309, 79 *L.Ed.*2d 707 (1984); *Stout v. United States,* 508 *F.*2d 951, 953 (6th Cir.1975); *Masciola v. United States,* 469 *F.*2d 1057, 1059 (3d Cir.1972); *Holland v. United States,* 406 *F.*2d 213, 216 (5th Cir.1969); *see also State v. Rodriguez,* 179 *N.J.Super.* 129, 136, 430 *A.*2d 957 (App.Div.1981) (holding that defendant's negotiated guilty plea to sexual assault rendered in part on counsel's erroneous sentencing prediction could not be withdrawn).

In *Wellnitz,* a *habeas corpus* petitioner alleged that "on the day of his plea hearing, his attorney drew him aside in the courtroom, and state[d] that '25 years was the best he could do.' " 420 *F.*2d at 936. Based on that advice, the defendant entered a guilty plea. Denying the defendant's attempt to withdraw his plea, the Tenth Circuit held that a "prediction" offered by an attorney "based upon his experience and instinct," that turns out to be wrong "does not render a plea involuntary." *Ibid.*

We agree. Nothing in the record suggests that DiFrisco's attorney ever advised him that pleading guilty forestalled the legal possibility of a death sentence. That his attorney's opinion, viewed with hindsight, was mistaken, cannot transform DiFrisco's voluntary plea into an involuntary one.

We are satisfied that the trial court's refusal to grant defendant's motion to withdraw his plea was a proper exercise of discretion. The trial court

> fairly and justly weigh[ed] the policy considerations [that] favor the finality of judicial procedures against the policy considerations [that] dictate that no man be deprived of his life or liberty except upon conviction after a fair trial or after entry of a plea of guilty or its equivalent under circumstances which evidence that it was made truthfully, voluntarily and understandingly.
>
> [*State v. Deutsch*, 34 *N.J.* 190, 197–98, 168 *A.*2d 12 (1961).]

*See also State v. Taylor*, 80 *N.J.* 353, 362, 403 *A.*2d 889 (1979) (holding that defendant's claim to be relieved of consequences of guilty plea must be weighed against strong State interest in finality).

### B. *Ineffective Assistance of Counsel*

■ Defendant also seeks to have his plea vacated on the ground that his attorney was constitutionally ineffective. According to defendant, his attorney, DeLuca, virtually directed him to plead guilty to capital murder. Defendant maintains that that advice constituted constitutionally-deficient legal service that resulted in severe prejudice.

The trial court analyzed defendant's claim under the two prong *Strickland–Fritz* test. See *Strickland v. Washington*, 466 *U.S.* 668, 687, 104 *S.Ct.* 2052, 2064, 80 *L.Ed.*2d 674, 693 (1984) (adopting deficiency-and-prejudice standard for determining violations of Sixth Amendment right to counsel); *State v. Fritz*, 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987) (adopting *Strickland* test for determining violations of right to counsel under New Jersey Constitution). The court determined that DeLuca's performance had not been constitutionally deficient and that DiFrisco had not been prejudiced by DeLuca's advice to plead guilty. The trial court therefore denied the motion to withdraw the plea because he found that neither prong of the *Strickland–Fritz* test was satisfied.

■ The United States Supreme Court has applied the *Strickland* test to challenges of guilty pleas based on ineffective assistance of counsel. See *Hill v. Lockhart*, 474 *U.S.* 52, 58, 106 *S.Ct.*

366, 371, 88 *L.Ed.*2d 203, 210 (1985). To set aside a guilty plea based on ineffective assistance of counsel, a defendant must show that (i) counsel's assistance was not "within the range of competence demanded of attorneys in criminal cases," *Tollett v. Henderson,* 411 *U.S.* 258, 266, 93 *S.Ct.* 1602, 1608, 36 *L.Ed.*2d 235, 243 (1973); and (ii) "that there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pled guilty and would have insisted on going to trial." *Hill, supra,* 474 *U.S.* at 59, 106 *S.Ct.* at 370, 88 *L.Ed.*2d at 210.

■ We agree with the trial court that DeLuca's performance was not constitutionally defective. The crux of defendant's "ineffectiveness" claim is DeLuca's erroneous sentencing prediction. Erroneous sentencing predictions, however, do not amount to constitutionally-deficient performance under *Strickland.* *E.g., Chichakly v. United States,* 926 *F.*2d 624, 630–31 (7th Cir.1991) (holding that erroneous sentencing prediction did not amount to constitutionally-deficient performance); *People v. Jones,* 144 *Ill.*2d 242, 162 *Ill.Dec.* 15, 25, 579 *N.E.*2d 829, 839 (1991) (holding that counsel's erroneous prediction that trial court would not enter death sentence did not amount to constitutionally-deficient performance), *cert. denied,* —— *U.S.* ——, 112 *S.Ct.* 3038, 120 *L.Ed.*2d 906 (1992).

■ We have rejected the argument that we should adopt a more stringent standard for reviewing the performance of counsel in capital cases. See *State v. Davis,* 116 *N.J.* 341, 355–57, 561 *A.*2d 1082 (1989). Thus,

[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from the counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

[*Strickland, supra,* 466 *U.S.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694–95 (quoting *Michel v. Louisiana,* 350 *U.S.* 91, 101, 76 *S.Ct.* 158, 164, 100 *L.Ed.* 83, 93 (1955)).]

Here, DeLuca made a reasonable determination that DiFrisco would not be acquitted by a jury, given his confession and the corroborating forensic evidence. He also reasonably believed that a cold-blooded, execution-style murder for hire posed a devastating set of facts to present to a jury. Moreover, DeLuca reasonably perceived that the trial court was impressed with his client's cooperation and was also disturbed at the State's failure to indict Franciotti, the man who allegedly paid DiFrisco to commit the murder. DeLuca's ultimate prediction that the trial court would not sentence his client to death, although wrong, was reasonable. *Strickland,* however, demands that the ineffective-assistance-of-counsel analysis "eliminate the distorting effects of hindsight." 466 *U.S.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694.

Moreover, DeLuca never misinformed DiFrisco about the law, *see O'Tuel v. Osborne,* 706 *F.*2d 498, 500 (4th Cir.1983) (holding that mistakes of law that grossly misinform defendant amount to constitutionally-deficient performance), nor did DeLuca ever intentionally mislead defendant. *See Commonwealth v. Napper,* 254 *Pa.Super.* 54, 385 *A.*2d 521, 524 (1978) (holding that counsel's intentional misleading of client regarding benefit of plea constituted constitutionally deficient performance); *cf. A.B.A. Project on Standards for Criminal Justice Standards Relating to the Defense Function,* Standard 4–5.1(b) (1980) ("It is unprofessional conduct for the lawyer *intentionally* to understate or overstate the risks, hazards, or prospects of the case to exert undue influence on the accused's decision as to his or her plea." (emphasis added)).

Likewise, we are satisfied that although DeLuca had never before represented a capital defendant and did not engage in a lengthy investigation of the facts and circumstances of the murder, he did " 'make a reasonable decision that ma[de] particular investigations unnecessary.' " *State v. Savage,* 120 *N.J.* 594, 618, 577 *A.*2d 455 (1990) (quoting *Strickland, supra,* 466 *U.S.* at 691, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695). After the trial court denied the motion to suppress DiFrisco's confession, DeLuca testified that

searching for non-existent witnesses would have proved fruitless. He was legitimately convinced that DiFrisco had no viable psychiatric or fact-based defense.

We agree with the trial court that DeLuca's representation of DiFrisco was not constitutionally deficient. Hence, defendant has failed to prove the first prong of the *Strickland* test. Accordingly, his claim for ineffective assistance of counsel fails.

## III. JURY ISSUES

### A. Dismissal of Darlene Grant

Defendant claims that the trial court's dismissal of Darlene Grant for cause because of her views on the death penalty violated his rights to due process and an impartial jury. Defendant maintains that Grant's feelings about capital punishment as elicited during *voir dire* did not meet the legal threshold for removal for cause.

Trial courts possess considerable discretion in determining the qualifications of prospective jurors. *State v. Martini*, 131 *N.J.* 176, 218, 619 *A.*2d 1208 (1993); *State v. Pennington*, 119 *N.J.* 547, 589, 575 *A.*2d 816 (1990). A trial court's removal of a prospective juror for cause will not be reversed unless the court has abused its discretion. *Pennington, supra,* 119 *N.J.* at 589, 575 *A.*2d 816; *State v. Ramseur,* 106 *N.J.* 123, 260, 524 *A.*2d 188 (1987). The wide latitude afforded trial courts in the determination of a prospective juror's qualifications stems from the inability of appellate courts to appreciate fully the dynamics of a trial proceeding. As we noted in *Ramseur, supra:*

> We can profit from an occasional reminder of the limitations that our isolation from the courtroom imposes on a full appreciation of the trial dynamics. As Judge Jayne once put it, even the best and most accurate record of oral testimony is like a 'dehydrated peach; it has neither the substance nor the flavor of the peach before it was dried.' *Trusky v. Ford Motor Co.,* 19 *N.J.Super.* 100, 104, 88 *A.*2d 235 (App.Div.1952); A bloodless record conceals subtle nuances; although we cannot always sniff them out, they do not often escape detection by our trial judges.
>
> [106 *N.J.* at 260, 524 *A.*2d 188 (Clifford, J., dissenting) (quoting *State v. Gilmore,* 103 *N.J.* 508, 547, 511 *A.*2d 1150 (1986)).]

Nonetheless, " 'a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath.' " *Id.* at 255, 524 *A.*2d 188 (quoting *Adams v. Texas,* 448 *U.S.* 38, 45, 100 *S.Ct.* 2521, 2526, 65 *L.Ed.*2d 581, 589 (1980)). If the reason for exclusion is other than an inability to follow the law or abide by one's oath as a juror, the death penalty may not stand. *Id.* at 255–56, 524 *A.*2d 188. The improper removal for cause of a prospective juror violates a defendant's Sixth Amendment right to an impartial jury. *Wainwright v. Witt,* 469 *U.S.* 412, 423, 105 *S.Ct.* 844, 851, 83 *L.Ed.*2d 841, 851 (1985).

In determining whether a prospective juror's views on the death penalty warrant removal for cause, a trial court need not demonstrate the prospective juror's bias "with unmistakable clarity." *Ramseur, supra,* 106 *N.J.* at 256, 524 *A.*2d 188. In fact, to warrant removal for cause a juror's opposition to the death penalty need not be automatic. Yet, " 'nervousness, emotional involvement [and] inability to deny or confirm' " that the gravity of the task would not have any effect on their ability or willingness to perform their duties is not " 'equivalent to an unwillingness or an inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty.' " *Ibid.* (quoting *Adams, supra,* 448 *U.S.* at 50, 100 *S.Ct.* at 2529, 65 *L.Ed.*2d at 592–93).

No hard-and-fast rules exist to determine whether the removal for cause was proper. In the end, a trial court in the exercise of sound discretion, must decide whether the responses elicited from a prospective juror indicate a view that would prevent or substantially impair that juror's performance in accordance with court's instructions and that juror's oath.

Grant's responses during *voir dire* establish her inability to perform as a juror in a capital case.

Court: ... The jury is going to have to make a decision whether he should go to prison, and if he goes to prison, he's got to go for 30 years without parole.

Juror: Yes.

Court: And I can sentence him up to life imprisonment but there's another alternative. The jury may decide to sentence the Defendant to death.

That is the choice for this jury, between life and death. Do you understand that?

Juror: Yes.

Court: *Could you make that choice?*

Juror: *I don't think so.*

Court: *Pardon me?*

Juror: *No, I don't think so.*

Court: Okay, tell me why it troubles you? Tell me why you couldn't make that choice?

Juror: Well, I would probably think about it a lot, you know, it would bother me afterwards, I would keep thinking about it about whether I should not or shouldn't [sic], you know about whether I made the right decision or whatever.

[Emphasis added.]

Although Grant did not feel compelled by any religious or doctrinal belief to oppose capital punishment, she indicated that she would not be able to look at the evidence as it was presented.

Court: Is there anything in your—do you have any particular religious training that instructs you either way with respect to the death penalty?

Juror: No.

. . . .

Court: Okay. Is there any ethical or moral view that you have of your own that says that the death penalty is either right or wrong punishment for murder?

Juror: I don't think, I would have to look at so many things, your Honor, why— how it was committed.

Court: *Would you be willing to look at it and consider those things?*

Juror: *Not really.*

. . . .

Court: Why not?

Let's take an example of a murder for hire, suppose it was proven beyond a reasonable doubt that a Defendant had murdered somebody to get money. Is that somebody who you would be leaning towards death as punishment or away from death as a punishment in terms of what would be appropriate?

Juror: *I wouldn't say death.*

. . . .

Court: Is there anything in your personal views that would prevent you from returning a verdict of death in a murder case?

Juror: I just wouldn't want to do it.

[Emphasis added.]

When repeatedly pressed by defense counsel, Ms. Grant did respond affirmatively when asked if she thought she could do her duty as a citizen, could listen and could evaluate the case fairly. She also hesitatingly agreed at one point under defense counsel's questioning that capital punishment could be an appropriate punishment in some cases and that she could engage in discussions about the case with other jurors. Yet, in the end, she repeated that she did not believe she could vote to sentence a defendant to death.

Court: Would you be able to sentence a Defendant to death?

Juror: I am not sure, honestly.

Court: What is that?

Juror: Honestly speaking?

Court: All we're asking you to do is to be honest. Would you be able to sentence a Defendant to death, ma'am?

Juror: Whatever, I don't think so.

We are satisfied that Ms. Grant's entire testimony reflects more than the "significant uncertainty [that] is to be expected in the average citizen when asked to discharge the task [of deciding between a sentence of life or death]." *Ramseur, supra,* 106 *N.J.* at 257, 524 *A.*2d 188. Although some of Grant's responses on cross-examination demonstrate a willingness to listen to the evidence and to consider the relevant law, we are mindful that "further questions . . . calculated to draw out only such answers as would rehabilitate her as a juror" are "not conducive to a sound determination of whether a juror should be dismissed for cause." *State v. Williams,* 113 *N.J.* 393, 439–40, 550 *A.*2d 1172 (1988).

Although Grant's opposition to capital punishment was not grounded in a verifiable religious or moral code, her inability to serve as a capital juror was nevertheless apparent. We have approved the excusal of prospective jurors for cause in similar situations. See *Martini, supra,* 131 *N.J.* at 217–18, 219, 619 *A.*2d 1208 (upholding exclusion for cause of juror who "expressed significant doubts about his ability to impose a death sentence under any circumstances," despite juror's assurance that he could follow oath and vote for death and upholding exclusion for cause of

juror who expressed "ambivalence about the possibility of voting for a death sentence"); *State v. Biegenwald,* 126 *N.J.* 1, 29, 594 *A.*2d 172 (1991) (upholding exclusion for cause of juror who expressed dissatisfaction with sentencing options and indicated that it would be " 'very difficult' " for him to vote to impose death); *State v. Marshall,* 123 *N.J.* 1, 96, 586 *A.*2d 85 (1991) (upholding exclusion for cause of juror who "expressed significant doubts about her ability to follow the court's instructions"); *State v. Moore,* 122 *N.J.* 420, 456–57, 585 *A.*2d 864 (1991) (upholding exclusion for cause of juror who expressed unwillingness to vote for death sentence and upholding exclusion for cause of juror who stated that she would find it difficult to vote for death sentence); *State v. Hunt,* 115 *N.J.* 330, 358, 558 *A.*2d 1259 (1989) (upholding exclusion for cause of juror who stated that she would not want and probably could not vote for death sentence). Applying the *Adams–Witt* test, we find that Grant's scruples "substantially impaired" her ability to follow the law. Thus, the trial court did not abuse its discretion in removing her for cause.

### B. Exclusion of Leslie Dawson

We turn next to the propriety of the trial court's decision not to exclude Leslie Dawson from the venire for cause based on pro-death penalty views. We then address the related issue of under what circumstances an erroneous failure to excuse a prospective juror for cause constitutes reversible error. After the court's refusal to excuse Dawson for cause, defendant exercised a peremptory challenge against her. Before the final juror was qualified, defendant had already exhausted his allotment of peremptory challenges, forcing him, he claims, to seat a "partial juror," Kennedy.

The threshold question that we must resolve is whether the trial court's decision not to exclude Dawson for cause was an abuse of discretion. *Pennington, supra,* 119 *N.J.* at 589, 575 *A.*2d 816; *Ramseur, supra,* 106 *N.J.* at 260, 524 *A.*2d 188. We employ the same standard in reviewing the propriety of a trial court's

decision to exclude or not to exclude a juror because of the juror's pro-death penalty views as we do when a juror expresses opposition to the death penalty. *See Williams, supra,* 113 *N.J.* at 437–38, 550 *A.*2d 1172 ("The same test that applies to a juror biased against imposition of the death penalty applies to a juror biased in favor of imposing capital punishment in all murder cases. Neither can serve fairly in the penalty phase."). The standard for both a pro- and anti-death-penalty juror is whether the juror's views about capital punishment " 'would prevent or substantially impair the performance of his or her duties as a juror in accordance with his instructions and oath.' " *Ramseur, supra,* 106 *N.J.* at 255, 524 *A.*2d 188 (quoting *Adams, supra,* 448 *U.S.* at 45, 100 *S.Ct.* at 2526, 65 *L.Ed.*2d at 589); *see also State v. Bey,* 112 *N.J.* 123, 152, 548 *A.*2d 887 (1988) ("Although *Witherspoon, Adams,* and *Witt* dealt with the exclusion of opponents of the death penalty, we believe that the same standard should apply to jurors who are proponents of the death penalty.").

Whether Dawson's views would have prevented or substantially impaired her performance as a juror is a close question. The most troubling responses elicited from Dawson concern her views on murder for hire.

Q Do you have any feelings about murders that are done for hire?

A Yeah.

Q What are your feelings?

A I believe if you're paid, if someone pays you to kill someone else, then that's another case where, for me, for the death penalty.

Q Would you vote for the death penalty automatically in such a case?

A Most likely, unless I heard something, some strong evidence to change my mind and most likely I would go for the death penalty.

 * * * * * * * *

Q Good afternoon, ma'am. Miss Dawson, my name is Peter Liquori and I, along with Michele Soto, we represent Mr. DiFrisco here.

MS. SOTO: Good afternoon.

Q And coming off of what Mr. Bogdanski was saying, you know, in our minds we make decisions by balancing things. Right? Would you agree with that?

A Yes.

Q Kind of weighing things from side to side.

Would you—and I—hearing what you said, you're very concerned something about murder for hire, that that's murder in which you thought you would feel strongly about the death penalty.

A Yes.

Q Would your feelings about the death penalty weigh so heavily or weigh heavy enough in your mind that you would expect a lot of proof from the Defense about mitigating factors?

A Pretty much, yeah. I'd expect a lot of evidence to prove otherwise that this wasn't, I don't know—

Q I mean—

A I would need a lot. You see, I don't know what a lot in my mind would be. I would need enough in my mind, I would feel it would be enough for me to say, okay, I'd go a different way.

\* \* \* \* \* \* \* \*

Q What if I tell you, what if you hear evidence that someone took—was paid money, got the money, agreed to go kill somebody and then purposely, by their own hand, by their own conduct, walks up to somebody and basically unloads a gun into them, killing them.

After hearing that, what do you think about that, I mean, after hearing those facts, could you consider anything but the death penalty?

A Not if they were paid money to go up and do this, no.

Yet, Dawson repeatedly indicated that she would consider all evidence presented before reaching a conclusion.

Q Would that aggravating factor affect you to the degree that in reality you really couldn't consider mitigating evidence? Is that what you're telling me?

A No, I would consider it. I would consider it. I would listen to it and consider it and like I said, if it was very very good evidence, to sway me in a different way, then, you know, I would take it into consideration and listen to it and maybe go another way. But if it wasn't, if I didn't feel it was good enough for me to sway me in a different way, then I'd have to go with what I feel.

\* \* \* \* \* \* \* \*

Q I mean, if you hear testimony, if the testimony that you hear that's presented to you, would you consider testimony that wasn't related to the circumstances of the offense but were related to someone's—their background, their family, you know, their mental state of mind?

A I would take every bit of evidence, I would take everything I heard into consideration and like I said, if it was enough to make me sway a different way, then I would, you know, I would have to consider going instead of the death penalty, for life.

If it was enough to make me say that, you know, I don't think the death penalty is good for this situation, but it would have to be enough to make me want to, you know \* \* \*.

Ms. Dawson also indicated that she believed that her personal views on capital punishment would not prevent or substantially impair her from performing her duties as a juror.

Unlike the prospective juror we felt should have been excluded for cause in *Williams, supra,* 113 *N.J.* at 439, 550 *A.*2d 1172, Dawson never indicated that "she would automatically impose a death sentence for deterrence purposes even if circumstances warranted a life sentence." Yet, her responses did suggest the possibility that her ability to deliberate impartially was "substantially impaired" by her belief that those who murder for compensation should be put to death. *See Bey, supra,* 112 *N.J.* at 154, 548 *A.*2d 887 (holding that failure to exclude for cause juror who indicated that violent murderers should be put to death in almost all circumstances was abuse of discretion). Whether Dawson was not "'nearly as impartial as the lot of humanity will admit,'" *Williams, supra,* 113 *N.J.* at 441, 550 *A.*2d 1172 (quoting *State v. Jackson,* 43 *N.J.* 148, 158, 203 *A.*2d 1 (1964) (quoting *State v. White,* 105 *N.H.* 159, 196 *A.*2d 33, 34 (1963)), *cert. denied,* 379 *U.S.* 982, 85 *S.Ct.* 690, 13 *L.Ed.*2d 572 (1965)), is an extremely difficult question. Indeed, the trial court reserved its decision on defendant's motion to excuse Dawson until it reviewed a transcript of her testimony. Considering our deference to trial courts in *voir dire,* we are not convinced that the trial court erred in not excusing Ms. Dawson for cause, but, as our discussion below indicates, we need not decide that question.

### C. Forced Use of Peremptory ·Challenge

We now turn to an issue not initially addressed by either of the parties—but raised by the Court—namely, when a trial court erroneously fails to excuse a prospective juror for cause and the defense then peremptorily challenges that juror, does the subsequent exhaustion of peremptory challenges *per se* constitute reversible error or must defendant show actual prejudice?

In *Ross v. Oklahoma,* 487 *U.S.* 81, 108 *S.Ct.* 2273, 101 *L.Ed.*2d 80 (1988), the Supreme Court held that an erroneous

failure to excuse for cause followed by a peremptory challenge and the subsequent exhaustion of the defendant's allotment of peremptory challenges was not *per se* reversible error. *Id.* at 85–86, 108 *S.Ct.* at 2277, 101 *L.Ed.*2d at 88. To establish a violation of the Sixth Amendment guarantee of an impartial jury, a defendant must demonstrate that one of the jurors who actually sat on the jury was partial. "Any claim that the jury was not impartial, therefore, must focus not on [the juror ultimately excused by a peremptory challenge], but on the jurors who ultimately sat." *Id.* at 86, 108 *S.Ct.* at 2277, 101 *L.Ed.*2d at 88. The loss, by itself, of a peremptory challenge does not violate the constitutional right to an impartial jury because "peremptory challenges are not of constitutional dimension." *Id.* at 88, 108 *S.Ct.* at 2278, 101 *L.Ed.*2d at 90.

Nonetheless, the *Ross* Court left open the possibility of an automatic-reversal rule under state law. *Id.* at 89, 108 *S.Ct.* at 2279, 101 *L.Ed.*2d at 90. We have not heretofore explicitly rejected a *per se* reversal rule as matter of state law. See *Williams, supra,* 113 *N.J.* at 445, 550 *A.*2d 1172 ("We need not decide whether the loss of a peremptory challenge in this case where all peremptories were ultimately exhausted would, by itself, warrant reversal."); *see also Bey, supra,* 112 *N.J.* at 154–55, 548 *A.*2d 887 ("In the present, we need not determine whether that error would be reversible under article I, paragraph 10 of the New Jersey Constitution.").

Such a rejection, however, is implicit in a number of our cases. See, *e.g., Williams, supra,* 113 *N.J.* at 462–63, 550 *A.*2d 1172 (Handler, J., concurring) (noting that "the majority here seemingly adopts a jury-bias standard as the operative test for reversal"). In fact, our explicit holding in *Bey, supra,* 112 *N.J.* at 154, 548 *A.*2d 887, that the erroneous failure to excuse a juror for cause where the defense had not exhausted its allotment of peremptory challenges was harmless error, demonstrates that we have never viewed the loss of a peremptory challenge as *per se* reversible error. *See State v. Rios,* 17 *N.J.* 572, 592, 112 *A.*2d 247 (1955)

(applying harmless error standard to erroneous loss of peremptory challenge); *State v. Deegan,* 133 *N.J.L.* 263, 268, 44 *A.*2d 104 (E. & A.1945) (same); *State v. Calabrese,* 107 *N.J.L.* 115, 151 *A.* 781 (E. & A.1930) (same); *State v. Lynch,* 103 *N.J.L.* 64, 134 *A.* 760 (E. & A.1926) (same); *see also State v. Deatore,* 70 *N.J.* 100, 105, 358 *A.*2d 163 (1976) (reversing for failure to excuse juror for cause where peremptories were exhausted because of indication that error was prejudicial); *Wright v. Bernstein,* 23 *N.J.* 284, 294, 129 *A.*2d 19 (1957) (reversing for failure to excuse juror for cause where peremptories were exhausted because potentially-biased juror sat on jury).

 Moreover, we have consistently held that the right of a peremptory challenge is not a fundamental right guaranteed by the federal or State Constitutions. *State v. Brunson,* 101 *N.J.* 132, 136, 501 *A.*2d 145 (1985). Although the right to exercise peremptory challenges is a " 'substantial right,' " *State v. Singletary,* 80 *N.J.* 55, 62, 402 *A.*2d 203 (1979) (quoting *Wright, supra,* 23 *N.J.* at 295, 129 *A.*2d 19), "with deep historic roots," *Brunson, supra,* 101 *N.J.* at 136, 501 *A.*2d 145, it is a creature of statute designed " 'to eliminate extremes of partiality on both sides, [and] to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them and not otherwise.' " *Id.* at 137–38, 501 *A.*2d 145 (quoting *Swain v. Alabama,* 380 *U.S.* 202, 219, 85 *S.Ct.* 824, 835, 13 *L.Ed.*2d 759, 772, *reh'g denied,* 381 *U.S.* 921, 85 *S.Ct.* 1528, 14 *L.Ed.*2d 442 (1965) (alteration in original)); *see also J.E.B. v. Alabama,* —— *U.S.* ——, —— n. 7, 114 *S.Ct.* 1419, 1426 n. 7, 128 *L.Ed.*2d 89, 102 n. 7 (1994) ("Although peremptory challenges are valuable tools in jury trials, they 'are not constitutionally protected fundamental rights; rather they are but one state-created means to the constitutional end of an impartial jury and a fair trial.' " (quoting *Georgia v. McCollum,* 505 *U.S.* ——, ——, 112 *S.Ct.* 2348, 2358, 120 *L.Ed.*2d 33, 50 (1992))).

 The goal of peremptory challenge is to secure an impartial jury. *See Brunson, supra,* 101 *N.J.* at 138, 501 *A.*2d

145; *see also Swain, supra,* 380 *U.S.* at 212–20, 85 *S.Ct.* at 831–36, 13 *L.Ed.*2d at 768–73 (sketching origins of right of peremptory challenge). Thus, to hold that the loss of a peremptory challenge will cause a reversal unless that loss ultimately results in a partial jury makes little sense. The argument that such a jury-bias standard for reversal effectively eliminates the need for peremptory challenges because "for cause" removals already guarantee impartiality misunderstands the nature of "for cause" challenges. To remove a juror for cause, the challenging party must demonstrate that the juror's views would prevent or substantially impair the performance of that juror's duties in accordance with the court's instructions and the juror's oath. *Ramseur, supra,* 106 *N.J.* at 255, 524 *A.*2d 188. Absent violations of equal protection, see, *e.g., J.E.B., supra,* —— *U.S.* ——, 114 *S.Ct.* 1419, 128 *L.Ed.*2d 89 (holding that peremptory challenge exercised solely on basis of gender violated Equal Protection clause); *Batson v. Kentucky,* 476 *U.S.* 79, 106 *S.Ct.* 1712, 90 *L.Ed.*2d 69 (1986) (holding that peremptory challenge exercised solely on basis of race violated Equal Protection clause), "[t]he peremptory challenge, unlike challenges for cause, requires neither explanation nor approval by the court." *Brunson, supra,* 101 *N.J.* at 138, 501 *A.*2d 145.

In certain situations, a prospective juror's responses during *voir dire* may not indicate that his or her views would prevent or substantially impair performance as a juror, but a party may nonetheless detect some disfavorable leaning. That is precisely the situation in which a party is likely to exercise a peremptory challenge. Thus, a jury-bias rule does not render peremptories superfluous, but merely recognizes that only when jurors who should have been removed for cause sit on the jury is the constitutional guarantee of an impartial jury offended.

The dilution of number of statutorily-prescribed peremptories by the erroneous failure to excuse a juror for cause is of no moment to the constitutional guarantee of an impartial jury. Were it otherwise, we would be forced to recognize a constitutional right to an unlimited number of peremptories because, like the

dilution of the number of peremptories caused by a trial judge's erroneous failure to remove a juror for cause, the Legislature's provision for a certain finite number of peremptories would have to be seen as an unconstitutional limitation on the ability of a defendant to secure an impartial jury. We have never suggested such a rule. To the contrary, the Legislature may set the number of peremptory challenges at fifty, twenty, ten or zero, if it so choses, because the choice of peremptory challenge is merely a statutory guarantee.

For those reasons, we find that for the forced expenditure of a peremptory challenge to constitute reversible error under New Jersey law, a defendant must demonstrate that a juror who was partial sat as a result of the defendant's exhaustion of peremptories. That view is consistent with the United State's Supreme Court's analysis in *Ross, supra,* with our prior decisions, and with our belief that a peremptory challenge is not a fundamental constitutional right. It also is the rule recognized by several federal circuit courts and at least twenty-two other states.[1]

---

[1] *United States v. McIntyre,* 997 F.2d 687, 698 (10th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 736, 126 L.Ed.2d 699 (1994); *United States v. Cruz,* 993 F.2d 164, 168–69 (8th Cir.1993); *United States v. Farmer,* 923 F.2d 1557, 1566 (11th Cir.1991); *United States v. Towne,* 870 F.2d 880, 885 (2d Cir.), *cert. denied,* 490 U.S. 1101, 109 S.Ct. 2456, 104 L.Ed.2d 1010 (1989); *United States v. Brown,* 644 F.2d 101, 104 (2d Cir.), *cert. denied,* 454 U.S. 881, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981); *Pickens v. State,* 301 Ark. 244, 783 S.W.2d 341, 345, *cert. denied,* 497 U.S. 1011, 110 S.Ct. 3257, 111 L.Ed.2d 766 (1990); *People v. Pride,* 3 Cal. 4th 195, 10 Cal.Rptr.2d 636, 656, 833 P.2d 643, 663 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1323, 122 L.Ed.2d 709 (1993); *State v. Pelletier,* 209 Conn. 564, 552 A.2d 805, 810 (1989); *State v. Dawson,* 581 A.2d 1078, 1093–96 (Del.1990), *vacated on other grounds,* —— U.S. ——, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992); *Trotter v. State,* 576 So.2d 691, 693 (Fla.1990); *State v. Graham,* 70 Haw. 627, 780 P.2d 1103, 1108 (1989); *State v. Ramos,* 119 Idaho 568, 808 P.2d 1313, 1315 (1991); *People v. Harris,* 231 Ill.App.3d 876, 173 Ill.Dec. 484, 486, 596 N.E.2d 1363, 1365, *appeal denied,* 147 Ill.2d 632, 180 Ill.Dec. 154, 606 N.E.2d 1231 (1992); *Robinson v. State,* 453 N.E.2d 280, 282 (Ind.1983); *State v. Neuendorf,* 509 N.W.2d 743, 747 (Iowa 1993); *State v. Mayberry,* 248 Kan. 369, 807 P.2d 86, 97–98 (1991); *Williams v. Commonwealth,* 829 S.W.2d 942, 943 (App.1992); *Hunt v. State,* 321 Md. 387, 583 A.2d 218, 234 (1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991); *Commonwealth v. Freiberg,* 405 Mass. 282,

■ To prove such error a defendant must show (1) that the trial court erred by failing to remove a juror for cause; (2) that the juror in question was eliminated by the exercise of defendant's peremptory challenge and that defendant exhausted his remaining challenges; and (3) that at least one of the remaining jurors that sat on the jury was a partial juror.

■ We assume that defendant meets the first two tests. Accordingly, we must decide whether any juror who should have been removed for cause ultimately sat on defendant's jury. Only one juror was called after defendant exhausted his challenges—juror Jung. No one challenged her impartiality at *voir dire*, nor does anyone assert such a challenge now. Instead the defense now points to juror Kennedy, whom defendant unsuccessfully challenged for cause. Defendant had not named Kennedy in his original brief, but did so in his court-requested supplementary brief on this issue. Before determining whether the trial court should have excused juror Kennedy for cause, we note that defendant's argument that juror Kennedy should have been removed for cause is belied by defendant's failure to have challenged Kennedy peremptorily. After defendant exercised a peremptory challenge against juror Dawson, he had sixteen peremptory challenges remaining. He used ten of those remaining sixteen to challenge prospective jurors whom he had not challenged for

540 *N.E.*2d 1289, 1296 *cert. denied,* 493 *U.S.* 940, 110 *S.Ct.* 338, 107 *L.Ed.*2d 327 (1989); *Chisolm v. State,* 529 *So.*2d 635, 639 (Miss.1988); *State v. Thompson,* 102 *Nev.* 348, 721 *P.*2d 1290, 1291 (1986); *State v. Tranby,* 437 *N.W.*2d 817, 824 (N.D.), *cert. denied,* 493 *U.S.* 841, 110 *S.Ct.* 128, 107 *L.Ed.*2d 88 (1989) (considering right only to impartial jury, not due process claim); *State v. Broom,* 40 *Ohio St.*3d 277, 533 *N.E.*2d 682, 695 (1988), *cert. denied,* 490 *U.S.* 1075, 109 *S.Ct.* 2089, 104 *L.Ed.*2d 653 (1989); *Commonwealth v. Ingram,* 404 *Pa.Super.* 560, 591 *A.*2d 734, 739 n. 4 (1991), *appeal denied,* 530 *Pa.* 631, 606 *A.*2d 901 (1992); *State v. Green,* 301 *S.C.* 347, 392 *S.E.*2d 157, 160 *cert. denied,* 498 *U.S.* 881, 111 *S.Ct.* 229, 112 *L.Ed.*2d 183 (1990); *State v. Jones,* 789 *S.W.*2d 545, 549 (Tenn.), *cert. denied,* 498 *U.S.* 908, 111 *S.Ct.* 280, 112 *L.Ed.*2d 234 (1990); *State v. Traylor,* 170 *Wis.*2d 393, 489 *N.W.*2d 626, 629, *review denied,* 491 *Wis.*2d 768, 491 *N.W.*2d 768 (1992).

cause.[2] The only juror called after defendant had exhausted his challenges (juror Jung) was not the subject of an earlier challenge for cause by the defense.

Although we have acknowledged the potentially harmful effect associated with an unnecessary use of a peremptory challenge, see *Bey, supra,* 112 *N.J.* at 155, 548 *A.*2d 887 (stating that "forcing a defendant to 'waste' a peremptory challenge could force defense counsel to be more cautious in the exercise of remaining peremptories"); *see also Williams,* 113 *N.J.* at 469, 550 *A.*2d 1172 (stating that "defendant cannot intelligently weigh each potential juror against others, making the exercise of each peremptory challenge a greater gamble and a more fateful decision"), we cannot help but conclude that defendant was not harmed by the forced use of a peremptory to strike juror Dawson. For whatever reason, defendant elected to challenge peremptorily a total of twelve other jurors whom he had not sought to challenge earlier for cause, instead of peremptorily challenging juror Kennedy. Ten of those twelve challenges occurred after juror Dawson was challenged. Moreover, if the defense felt restricted by the forced use of a peremptory to exclude juror Dawson, it could have requested additional peremptories, and the trial court would have been obliged to exercise its discretion "generously" in granting defendant's request. *See Bey, supra,* 112 *N.J.* at 155, 548 *A.*2d 887. The clear implication of defendant's failure to challenge juror Kennedy peremptorily is that he did not think that she was objectionable. Indeed, defense counsel stated in accepting the jury that "the jury is satisfactory."

We agree with the State that no basis existed to remove juror Kennedy for cause. Nothing in the *voir dire* record suggests that her views on capital punishment would have prevented or substan-

---

[2] Those ten include jurors McKenzie, Halpin, Brasseur, Fortunato, Foggie, Taylor, Chalet, Gains, Ramachandran, and McNeil. Prior to exercising a peremptory against Dawson, defendant also exercised peremptories against two other prospective jurors (Scheinhorn and Naeris) whom he had not challenged for cause.

tially impaired her performance as juror in accordance with her instructions and oath. *Ramseur, supra,* 106 *N.J.* at 255, 524 *A.*2d 188; *Adams, supra,* 448 *U.S.* at 45, 100 *S.Ct.* at 2526, 65 *L.Ed.*2d at 589.

She stated throughout *voir dire* that she would consider all evidence in mitigation and weigh such evidence against any of the aggravating factors that the State would have to prove. Although she stated she believed in the death penalty as a general proposition, she repeatedly indicated a willingness to review the evidence as presented and to follow the court's instructions. At one point she did indicate that she did not feel that drug addiction reduced the seriousness of a crime, but she also indicated that she would follow the court's instructions about whether it should be considered a mitigating factor. As did the trial court, we reject the defense's characterization of juror Kennedy's responses as indicating a pro-death penalty bias. The court stated and we agree:

> That is not a fair characterization of her statements at all. She talked about a general view, she made it perfectly clear that she's capable of considering both the death penalty as well as life imprisonment and is willing to consider drugs as well so she is a perfectly sound juror.

Thus, we find that defendant's right to an impartial jury was not infringed by the forced use of a peremptory challenge on juror Dawson. We restate our position that an erroneous denial of a challenge for cause will not result in the reversal of a conviction unless defendant can show that the trial court's error interfered with the defendant's ability to obtain an impartial jury. *Rios, supra,* 17 *N.J.* at 592, 112 *A.*2d 247.

Because the trial court's decision not to excuse juror Kennedy was proper, the court's erroneous failure to excuse juror Dawson for cause was harmless error because no partial juror sat as a result of that error.

## IV. PROSECUTOR'S COMMENTS

Defendant claims that various comments made by the prosecutor throughout the penalty-phase proceeding deprived him of his

right to a fair trial and hence constitute reversible error. The State denies the allegation of misconduct, arguing that all the comments were well within the bounds of proper prosecutorial behavior. Defendant points to seven different comments.

"[T]he test for determining whether prosecutorial misconduct constitutes reversible error is whether the misconduct 'was so egregious that it deprived defendant of a fair trial.'" *Pennington, supra,* 119 *N.J.* at 565, 575 *A.*2d 816 (quoting *Ramseur, supra,* 106 *N.J.* at 322, 524 *A.*2d 188). The goal that rule seeks to foster is that "juries [will] ... reach a verdict and impose a penalty without inordinate exposure to unduly prejudicial, inflammatory commentary." *Williams, supra,* 113 *N.J.* at 453, 550 *A.*2d 1172. Although we impose a greater burden on prosecuting attorneys than defense attorneys on that issue, *see State v. Biegenwald,* 106 *N.J.* 13, 40, 524 *A.*2d 130 (1987) (stating that "prosecutors in capital cases have a special obligation to seek justice and to not simply convict, and ... we will scrupulously review conduct that falls short of this high standard"), "[i]t is well-established that prosecuting attorneys, within reasonable limitations, are afforded considerable leeway in making opening statements and summations." *Williams, supra,* 113 *N.J.* at 447, 550 *A.*2d 1172.

Against those standards, we review the seven comments at issue. We are satisfied that under the *Pennington* standard only one comment merits any extended discussion. The other six comments clearly did not deprive defendant of a fair trial. We therefore turn to an examination of the comment made by the prosecutor in summation that defendant contends represents the worst example of prosecutorial misconduct:

Pros.: ... Everybody reads the paper. Yeah, that's the thing that happened. That wasn't justice. It's a much, more personal thing now. Justice is going to be with twelve of you people. Only twelve of you can do justice.

Def. C.: Judge, I believe the fact of justice is inappropriate. It's what the appropriate punishment for Mr. DiFrisco is. It's not justice.

Court: Overruled. Go ahead.

Pros.: Once again, only twelve of you can do justice. Out of twelve of you only twelve of you can recognize aggravating factors and only twelve of you can stand up, with the courage, stand up and make the right decision. The only correct decision here is the death penalty. Thank you.

Defendant argues that those comments improperly stirred the passions and prejudices of the jurors and attempted to divert their attention away from a weighing of the aggravating and mitigating factors. Moreover, defendant claims that the prosecutorial appeal to do justice and have courage, in contrast to the absence of justice reported in the media, improperly encouraged the jurors to compare this case with other cases of which they were aware. As did the appeal to the jurors' passions, this comment, argues defendant, improperly " 'divert[ed] the juror's [sic] attention from the facts of the case before them.' " *State v. Rose*, 112 *N.J.* 454, 520, 548 *A.*2d 1058 (1988) (quoting *Ramseur, supra*, 106 *N.J.* at 322, 524 *A.*2d 188). The jeopardy associated with comments that divert the jurors' attention from the specific facts before them is the potential that those comments, in addition to denying defendant a fair trial, will infringe on the right of individualized sentencing. *See Woodson v. North Carolina*, 428 *U.S.* 280, 304, 96 *S.Ct.* 2978, 2991, 49 *L.Ed.*2d 944, 961 (1976) (recognizing constitutional right to individualized sentencing); *State v. Biegenwald*, 110 *N.J.* 521, 538–39, 542 *A.*2d 442 (1988) (same).

The State maintains that the prosecutor's appeal to the jurors to have courage and to do justice was neither designed to nor had the effect of diverting the jurors' attention from a consideration of the aggravating and mitigating factors. In fact, the State argues that the prosecutor's admonition to the jury that "only twelve of you can recognize aggravating factors" indicates that the comment in no way meant to divert the jurors' attention from their proper task. To the contrary, it focused them on that task, for the comment was part of a paragraph in the prosecutor's summation in which he was reviewing the aggravating factors and arguing that they outweighed the mitigating factors. The reference to other cases in the news media cannot fairly be seen as an attempt to invite the jury to deliver a death verdict for past injustices,

according to the State. Rather, it was an attempt once again to persuade the jury that they were uniquely qualified to focus on this particular case.

Although we do not condone the comments made by the prosecutor, we are satisfied that they did not jeopardize defendant's right to a fair trial and to individualized sentencing. Unlike the prosecutor whose statement we objected to in *State v. Purnell*, 126 *N.J.* 518, 545, 601 *A.*2d 175 (1992), the prosecutor did not tell the jury that the only way to demonstrate courage would be to vote for death. To the contrary, he urged the jurors to have the courage to render a verdict in accordance with the evidence, however the verdict turned out. Specifically, he told them at one point during summation, "whatever your verdict is, we will all leave this courtroom with our heads held high." Moreover, the statements did not urge the jury to send a message to society, nor did they scare the jury into believing that a death sentence was needed to protect society from a man like defendant. *See Rose, supra*, 112 *N.J.* at 521, 548 *A.*2d 1058 (criticizing prosecutor's statement to "send a message" to society); *Ramseur, supra*, 106 *N.J.* at 321, 524 *A.*2d 188 (condemning prosecutor's statement that suggested that jury should impose death penalty "to protect society from crime"). We are satisfied that that statement by itself, or in conjunction with other statements, *see State v. Kelly*, 97 *N.J.* 178, 218, 478 *A.*2d 364 (1984) (stating that sum of statements may amount to reversible error, even where one would not by itself), was not so egregious as to warrant reversal.

## V. *ALLOCUTION STATEMENT*

Defendant objects to the trial court's failure to provide the jury with an instruction regarding his allocution statement. More specifically, defendant argues that the trial court should have instructed the jury to consider his allocution statement insofar as it affected any of the mitigating factors.

At the close of the evidence, defendant informed the court that he desired to exercise his right of allocution. The trial court first instructed the jury:

Members of the jury, under our law a defendant in a case such as this is entitled to what we call a right of allocution. It is not an exercise of testifying, it is a right to speak to the jury and I had explained to Mr. DiFrisco what the limits are with respect to that and his remarks will be within those limits. It will be a brief discussion to you. Please give him your attention.

You may address the jury sir.

Then the defendant spoke:

Thank you, your Honor.

Ladies and gentlemen of the jury, I am deeply, deeply sorry for taking the life of Mr. Potcher. I'm equally sorry for his family as well as mine. I ask you and I plead with you to spare my life, not to give me the death penalty. Thank you. Thank you all.

The State argued that the trial court should have instructed the jury that it could not consider the above allocution statement in determining the existence of any mitigating factor. In the end, the trial court elected not to refer to defendant's allocution in its charge. Defense counsel did not request an allocution instruction, nor did defense counsel object to the court's charge. Although why the trial court failed to give an instruction on the allocution statement is not entirely clear, the court appears to have been attempting to reach a compromise position. Although reasoning that the allocution statement was not testimony and, hence, not evidence to be considered as establishing a mitigating factor, the court also recognized defendant's right to present a statement in allocution. See *State v. Zola*, 112 *N.J.* 384, 430, 548 *A.*2d 1022 (1988), *cert. denied*, 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L.Ed.*2d 205 (1989).

Although a defendant may not contradict other testimony or argue legal points in allocution, a defendant may make a statement in order to allow a jury to ascertain that he or she is an " 'individual capable of feeling and expressing remorse and of demonstrating some measure of hope for the future.' " *Ibid.* (quoting J. Thomas Sullivan, *The Capital Defendant's Right to Make a Personal Plea for Mercy: Common Law Allocution and*

*Constitutional Mitigation,* 15 *N.M.L.Rev.* 41, 41 (1985)). The right to make a statement in allocution is not constitutionally guaranteed, *id.* at 429, 548 *A.*2d 1022, but it is a common-law right of the criminal defendant. *Id.* at 428, 431–32, 548 *A.*2d 1022.

Although no one disputes that defendant had a right to make a statement in allocution, the parties differ over whether the jury should consider such a statement in determining the existence of one or more mitigating factors. The State argues that allocution is designed not to affect mitigating evidence but to remind the jury of defendant's humanity. The State relies on the fact that the right of allocution is limited, as well as our statement in *Zola,* *supra,* that allocution reflects our common humanity, which recognizes that a defendant should not be sentenced to death by a jury " 'which never heard the sound of his voice.' " *Id.* at 429–30, 548 *A.*2d 1022 (quoting *McGautha v. California,* 402 *U.S.* 183, 220, 91 *S.Ct.* 1454, 1474, 28 *L.Ed.*2d 711, 733 (1971)). Defendant maintains that an allocution statement, as defined in *Zola, supra,* is a "brief unsworn statement *in mitigation* to the jury." 112 *N.J.* at 431, 548 *A.*2d 1022 (emphasis added). Thus, according to defendant, it can be considered in the determination of mitigating factors.

 As we explained in *Zola, supra,* 112 *N.J.* at 430–31, 548 *A.*2d 1022, the purpose of allocution is two-fold. First, it reflects our commonly-held belief that our civilization should afford every defendant an opportunity to ask for mercy. Second, it permits a defendant to impress a jury with his or her feelings of remorse. Because continued remorse for the victim may constitute a mitigating factor, *see N.J.S.A.* 2C:11–3c(5)(h) (stating that defendant may introduce evidence relating to character in mitigation), to afford defendants the right of allocution, the partial purpose of which is to demonstrate defendant's ability to feel remorse, and simultaneously to prohibit the jury from considering the allocution statement's impact on the mitigating factors presented would make little sense.

In this case, defendant sought to prove his remorse as a specific mitigating factor; therefore, the jury may consider his allocution statement in determining whether he is, in fact, remorseful, or whether the defense has established any other mitigating factor. That understanding is implicit in our opinion in *Zola, supra,* and accords with other jurisdictions that have addressed the issue. *See, e.g., People v. Davis,* 794 *P.*2d 159, 192 (Colo.1990), *cert. denied,* 498 *U.S.* 1018, 111 *S.Ct.* 662, 112 *L.Ed.*2d 656 (1991); *Booth v. State,* 306 *Md.* 172, 507 *A.*2d 1098, 111–12 (1986), *vacated in part,* 482 *U.S.* 496, 107 *S.Ct.* 2529, 96 *L.Ed.*2d 440 (1987). *But see State v. McNeil,* 324 *N.C.* 33, 375 *S.E.*2d 909, 912 (1989) (holding trial court did not err in refusing to submit remorse as mitigating factor where only factual support came from allocution), *vacated,* 494 *U.S.* 1050, 110 *S.Ct.* 1516, 108 *L.Ed.*2d 756 (1990).

▇▇▇ Although we hold that a jury may consider a defendant's statement in allocution in its consideration of any mitigating factors presented, we reemphasize the cautionary words of *Zola:*

Before a defendant speaks, he shall be instructed by the court, outside of the presence of the jury, *of the limited scope of the right; that his statement is subject to the court's supervision; and that should the statement go beyond the boundaries permitted, he will be subject to corrective action by the court including either comment by the court or prosecutor or in some cases possible reopening of the case for cross-examination.*

[112 *N.J.* at 432, 548 *A.*2d 1022 (emphasis added).]

▇▇▇ Because a jury may consider defendant's statement in allocution insofar as it affects any mitigating factors presented, trial courts should instruct the jury accordingly. The trial court, therefore, erred by failing to instruct the jury that it could consider defendant's statement insofar as it related to one or more of the mitigating factors.

At the time of trial, the following model instruction that had been adopted by the Committee on Capital Causes, in response to our suggestion in *Zola,* was in effect. "If the defendant exercises his right of allocution, the judge should instruct the jury that it may consider what the defendant stated insofar as it impacts on one or more of the mitigating factors." Trial Judges Committee

on Capital Causes, *Judges Bench Manual for Capital Causes* J(2)–40 (1993). We have been informed that this instruction has been deleted from the manual. We do not know the reasons for the deletion. However, until a new instruction is adopted by the Trial Judges Committee on Capital Causes, we think the prior instruction is an appropriate model for courts to use.

Yet, we are convinced that the trial court's failure to give such an instruction, which arises as plain error, was harmless. We do not agree with defendant that the failed allocution instruction deprived him of a constitutional right to have the jury consider information that would bear on a mitigating factor. The error was not of constitutional dimension. It would be odd indeed to have a rule that recognizes that the complete deprivation of the right of allocution is not constitutional in dimension, *Zola, supra,* 112 *N.J.* at 428, 431, 548 *A.*2d 1022, but that nevertheless concedes that a failure to instruct a jury on how to analyze an allocution statement is. Thus, we need only be satisfied that the failed instruction was not "clearly capable of producing an unjust result." *R.* 10–2; *State v. Macon,* 57 *N.J.* 325, 337–38, 273 *A.*2d 1 (1971).

We conclude that the failed instruction was not clearly capable of producing an unjust result. One of the mitigating factors that defendant submitted was that he "remains remorseful about killing Edward Potcher." The failure to give the instruction did not in any way prohibit the jury from considering defendant's allocution statement as an indication of his remorse, which is the only mitigating factor it could have affected. Although the court advised the jury that the evidence it could consider in its deliberations consisted of sworn testimony and exhibits, later in the charge the trial court made clear that evidence included all "material" presented by both sides at this trial. The court also advised the jury that the mitigating factors listed on the verdict sheet were non-exclusive. Moreover, continued remorse for the victim was listed on the verdict sheet as a mitigating factor. Still, eleven jurors did not find that mitigating factor.

## VI. JURY VERDICT

Defendant also argues that the jury attempted to return a non-unanimous verdict and that the trial court erroneously failed to accept it. In addition, defendant maintains that the court compounded its error by giving the jury a coercive supplemental instruction that suggested that a unanimous verdict was required. Each error by itself and, *a fortiori*, the two errors in combination warrant reversal, according to defendant. The State challenges defendant's characterization of the record and argues that the jury never reached a non-unanimous verdict and that the trial court's supplemental instruction was not coercive.

The relevant facts and the sequence of events surrounding this issue are as follows. On February 4, 1993, after the close of evidence, the trial court gave its initial instructions to the jury. In those instructions, the court clearly informed the jury that a non-unanimous verdict was an entirely acceptable outcome:

If you individually and unanimously find that the State has proven one or more aggravating factors beyond a reasonable doubt and beyond a reasonable doubt such factor or factors outweigh the mitigating factor or factors that you or one or more of you have found to exist, then the punishment shall be death. [If a]fter a full discussion you cannot reach a unanimous verdict on the question of punishment as to the murder, then in that case the sentence will be imprisonment for the term of years previously described.

A decision to disagree as to punishment after due deliberation is permissible since your job is not necessarily to reach agreement but to deliberate.

The potential of a non-unanimous verdict was also set forth on the verdict sheet.

After deliberating for approximately four hours, the jury sent out a note indicating that it had reached a verdict. The following exchange occurred on the jury's return to the courtroom:

THE COURT: Mr. Foreman, the jury has reached its verdict. Is that correct?

THE FOREMAN: Yes.

THE COURT: Are the verdicts unanimous?

THE FOREMAN: No, it's not.

THE COURT: With respect to Question No. 1, aggravating factors, do you unanimously find beyond a reasonable doubt that any of the following aggravating factors exist: A, the Defendant committed the murder as consideration for the receipt or an expectation of receipt of anything of pecuniary value?

THE FOREMAN: We have to go back.

JUROR NO. 9: We have to back, we didn't complete the entire list. We didn't unanimously decide on that.

THE COURT: Fill in the verdict form. Just remain, we'll wait.

After a brief recess, the trial court informed the attorneys for both sides that it believed that it should have told the jury to deliberate further and not merely to complete the verdict sheet.

In reconsidering my suggestion that the jury go back and fill out the form, I think that's not in accordance with *State v. Ramseur*, 106 *N.J.* 123 [524 *A.*2d 188] or *State v. Hunt*, 115 *N.J.* 330 [558 *A.*2d 1259]. The jury indicated that their verdicts were not unanimous. If that's referring to the ultimate verdict, they have only been out about four-and-a-half hours all together and it's clear to me under *Hunt* and *Ramseur* that at the very least where they have not sent out a note indicating they were deadlocked, further deliberations should take place. So I'm inclined to bring them out and tell them that.

Over defense counsel's objection, the court ordered the jury into the courtroom, and gave the following supplemental instructions:

Mr. Foreman, my first question to you, I guess, was whether the jury had reached a unanimous verdict and in asking that question I intend to be referring to the last page, namely, the decision of the jury. You had indicated, I'm not sure whether my statement or question was clear, but you had indicated that the jury had not reached a unanimous agreement. With respect to the situation as it stands now, the question would be, whether you had deliberated sufficiently and had reached the genuine stalemate with respect to the question of what the verdict should be or whether further deliberations would be productive. So I want you to return to your deliberations and consider that. Okay. You may return to your deliberations.

The jury then resumed its deliberations and later that day announced that it had reached a unanimous verdict.

THE COURT: Mr. foreman, has the jury reached a unanimous verdict with respect to the choices on page 5?

THE FOREMAN: Yes, we have.

THE COURT: Going to page 1, do you unanimously find beyond a reasonable doubt that any of the following aggravating factors exist. Factor A, the Defendant committed the murder as consideration for the receipt or in expectation of receipt of anything of pecuniary value. What was the answer on that?

THE FOREMAN: Yes.

THE COURT: B, the murder was committed for the purpose of escaping detection, apprehension, trial, punishment or confinement for another offense previously committed by another person. What was your answer on that?

THE FOREMAN: On B, your Honor, there was one no vote and 11 yes.

THE COURT: Okay. So that was—that makes that a no.

\* \* \* \* \* \* \* \*

THE COURT: Now, with respect to No. 3, which have you marked, have you checked A, B, or C?

THE FOREMAN: We have checked B.

THE COURT: B indicates that the jury is unanimously satisfied beyond a reasonable doubt that any aggravating factor or factors proven to exist outweigh the mitigating factors and the trial Judge will sentence the Defendant to death. You've answered yes to that?

THE FOREMAN: Yes, your Honor.

THE COURT: With respect to, if you have unanimously found more than one aggravating factor present, then indicate as to each such factor whether it, by itself, outweighs the mitigating factors beyond a reasonable doubt and did you answer on that?

THE FOREMAN: We checked A.

THE COURT: No or yes?

THE FOREMAN: Yes.

The court then polled the jurors, and all answered affirmatively regarding the unanimous finding of the aggravating factor and that the aggravating factor outweighed the mitigating factor(s). Shortly thereafter, defendant moved to set aside the death verdict and impose a life sentence, claiming that when the jury returned and indicated that it had reached a non-unanimous verdict on the murder-for-hire aggravating factor, all deliberations should have ended and the court should have entered a life verdict. Defendant further complained about the court's instructions that the jury continue deliberations because a deadlock had not occurred. The court denied defendant's motion.

### A. Jury Deadlock

 We first turn to the issue of whether the jury had reached a non-unanimous verdict. If the jury had reached a non-unanimous verdict, the trial court should have accepted that verdict and sentenced defendant to life imprisonment pursuant to *N.J.S.A.* 2C:11-3c(3)(c). See *Ramseur, supra,* 106 *N.J.* at 301, 524 *A.2d* 188; *Hunt, supra,* 115 *N.J.* at 379–80, 558 *A.2d* 1259. The law is now well settled that the "Legislature contemplated three possible final verdicts in a capital case: a unanimous verdict that results in

imprisonment, a unanimous verdict that results in death, and a non-unanimous verdict that results in imprisonment." *Ramseur, supra,* 106 *N.J.* at 301, 524 *A.*2d 188; *see Hunt, supra,* 115 *N.J.* at 380, 558 *A.*2d 1259. We have repeatedly emphasized and state again here that all three verdicts are appropriate outcomes that must be accepted by the trial court.

The question of whether the jury has, in fact, reached a non-unanimous verdict requiring the entry of a life sentence, however, often requires close analysis. In *Ramseur,* after deliberating for almost four hours, the jury sent out a note to the trial court: "Jury unable to reach a unanimous decision. Suggestions please." 106 *N.J.* at 301, 524 *A.*2d 188. We were not convinced "that the jury in fact had reached a non-unanimous verdict that the trial court was required to accept." *Id.* at 303, 524 *A.*2d 188. We held that the trial court did not err in ordering the jury to continue its deliberations. *Ibid.* Because the jury itself asked for suggestions, we found entirely reasonable the trial court's conclusion that the jury did not regard itself as deadlocked. *Id.* at 302, 524 *A.*2d 188.

Like the *Ramseur* jury, the jury in this case clearly did not believe that it was deadlocked. On its own initiative, the jury told the trial court that it had to go back. Both the foreman and another juror spontaneously declared, "We have to go back," and indicated that the jury had not completed its task. Contrary to indicating that they were deadlocked and could not benefit from additional deliberations, the jurors asked to go back to the jury room. Defendant overlooks the jurors own statements. They obviously believed that they had more to do, not that they had reached an impasse.

We disagree with defendant's conclusion that the foreman's response "No, it's not" to the court's question "Are the verdicts unanimous?" indicated that the jury had reached a non-unanimous verdict that the trial court should have accepted. That conclusion ignores the exchange that occurred immediately thereafter in which the foreman and another juror indicated the need to return

to the jury room. Whether the jury needed to return to the jury room only to complete the ministerial task of completing the verdict sheet or whether the return to the jury room was also necessitated by the need to deliberate further is unclear.

What is clear, however, is that the jury did not view itself as having reached one of the three permissible verdicts, despite the foreman's response seemingly indicating that the *verdicts* were not unanimous. The foreman was undoubtedly confused by the court's inquiry into the *verdicts* (plural) reached by the jury. Although we realize that the court was referring to the jury's final *verdict* (singular), whether any of the aggravating factors unanimously found outweighed any or all the mitigating factors beyond a reasonable doubt, the court's question implicated a number of issues facing the jury. More specifically, the jury had to decide on two separate aggravating factors and seventeen separate mitigating factors as well as the ultimate question involving the balancing of the aggravating and mitigating factors. The jurors were not unanimous on all those questions, and the foreman's response, given what transpired immediately thereafter, was most likely an indication of the non-unanimity of the jurors on one of the aggravating factors and many of the mitigating factors.

In hindsight, perhaps, it would have been better if the court had explored with the jury the reason for its own request to return to the jury room. Defense counsel, however, made no such request, and in fact, did not object to the court's instruction to the jurors to fill in the verdict form. The foreman's and juror nine's spontaneous utterances indicating that the jury had not completed its task support the court's conclusion that the jury had not reached its verdict.

Moreover, the court's decision to instruct the jury to deliberate further was a proper exercise of discretion. As was the case in *Ramseur*, the jury had deliberated for only approximately four hours. During that time the jury had to consider two aggravating factors, seventeen mitigating factors, and the proper balance between any of the aggravating factors unanimously found and the

mitigating factors. Requiring the jury to deliberate further, given the multiplicity of issues involved and the fact that the jury had not reached a verdict, was well within the bounds of discretion. *See Ramseur, supra,* 106 *N.J.* at 303, 524 *A.*2d 188; *see also Berryhill v. State,* 249 *Ga.* 442, 291 *S.E.*2d 685, 694 (holding that deliberations of more than ten hours in capital case were insufficient), *cert. denied,* 459 *U.S.* 981, 103 *S.Ct.* 317, 74 *L.Ed.*2d 293 (1982); *State v. Thompson,* 516 *So.*2d 349, 355–56 (La.1987) (holding that trial court's instructions to capital jury to continue deliberations after jury indicated in open court that it was deadlocked eleven to one but wanted to return to jury room was not abuse of discretion), *cert. denied,* 488 *U.S.* 871, 109 *S.Ct.* 180, 102 *L.Ed.*2d 149 (1988); *State v. Kirkley,* 308 *N.C.* 196, 302 *S.E.*2d 144, 158 (1983) (holding that trial court did not abuse discretion by failing to impose life sentence after jury had not reached unanimous verdict after seven-and-a-half hours of deliberation because that was reasonable period of deliberations given number of issues confronting jury), *overruled on other grounds by State v. Shank,* 322 *N.C.* 243, 367 *S.E.*2d 639 (1988); *Davis v. State,* 665 *P.*2d 1186, 1203 (Okla.Crim.App.) (recognizing that jury should be accorded reasonable time to deliberate), *cert. denied,* 464 *U.S.* 865, 104 *S.Ct.* 203, 78 *L.Ed.*2d 177 (1983); *Muniz v. State,* 573 *S.W.*2d 792, 794 (Tex.Crim.App.1978) (recognizing that "the exercise of discretion ... will be judged by the amount of time the jury deliberates in light of the nature of the case and the evidence"), *cert. denied,* 442 *U.S.* 924, 99 *S.Ct.* 2850, 61 *L.Ed.*2d 291 (1979); *Eaton v. Commonwealth,* 240 *Va.* 236, 397 *S.E.*2d 385, 399 (1990) (holding that it was not improper to require capital jury to continue deliberations after jury indicated that it was deadlocked two-and-a-half hours into deliberations), *cert. denied,* —— U.S. ——, 112 *S.Ct.* 88, 116 *L.Ed.*2d 60 (1991).

Contrary to defendant's argument, the events surrounding the jury here were not like those we discussed in *Hunt, supra,* 115 *N.J.* at 379–81, 558 *A.*2d 1259. In *Hunt,* after deliberating for approximately four hours, the jury sent out a note stating that it could not reach a unanimous verdict on the balance of aggravating

and mitigating factors. *Id.* at 379, 558 *A.*2d 1259. The trial court acknowledged receipt of the note, but instructed the jury to continue its deliberations. One hour later, the jury returned a unanimous verdict. *Ibid.* Concluding that the "trial court should have asked whether the jury's note indicated its final verdict or whether the jury wanted more time to deliberate," *id.* at 380, 558 *A.*2d 1259, we distinguished *Ramseur* by explaining that unlike the note there, the note sent by the *Hunt* jury did not clearly indicate that " 'the jury did not regard itself as deadlocked.' " *Ibid.* (quoting *Ramseur, supra,* 106 *N.J.* at 302, 524 *A.*2d 188).

Like Ramseur's jury and unlike Hunt's jury, the jury in this case clearly indicated that it did not regard itself as deadlocked. More so even than the *Ramseur* jury, this jury was positive that it wanted to continue its work. Thus, unlike in *Hunt,* the court was under no obligation to inquire whether the jurors had reached a final impasse because obviously that they had not.

### B. Supplemental Instructions

■ Defendant contends that the court's supplemental instructions impermissibly impelled the jurors to reach a unanimous verdict by failing to remind the jurors that a non-unanimous verdict was a permissible result. We disagree.

The trial court did nothing coercive. Nothing in the court's supplemental instructions could have had a coercive effect on the jurors. The jurors were not ordered to continue deliberations nor were they implicitly or explicitly scolded for failing to reach a unanimous verdict. Rather, the court merely asked the jurors to return to the jury room to consider, among themselves, whether they had reached a genuine stalemate and whether further *deliberations* would be productive. Unlike the instructions that we found in error in *Ramseur* and *Hunt,* the court's instructions were completely devoid of any suggestion that unanimity or agreement was required.

In *Ramseur,* we found that "[t]he supplemental charges delivered by the trial court . . . were saturated with remarks that

offend[ed] the *Czachor* strictures against charges which do not 'permit jurors to deliberate objectively, freely, and with an untrammeled mind.'" *Id.* at 306, 524 *A.*2d 188 (quoting *State v. Czachor*, 82 *N.J.* 392, 402, 413 *A.*2d 593 (1980)). The instructions in *Ramseur* were riddled with statements emphasizing the importance of unanimity, statements suggesting that any non-unanimous verdict demonstrated a betrayal of the jurors' oaths and civic responsibilities, and statements suggesting that a unanimous verdict was the only way to avoid a large waste of resources. *Id.* at 306–08, 524 *A.*2d 188. In *Hunt,* we objected to the supplemental instructions because they flowed from "a desire to produce unanimity" rather than from a desire "to assure that the jury ha[d] deliberated sufficiently to assure confidence in the ultimate verdict, whether or not it [was] unanimous." 115 *N.J.* at 385, 558 *A.*2d 1259. No similar objections are warranted in respect of the trial court's supplemental instructions in this case. In fact, its instructions mirror our admonition in *Ramseur* that such instructions should not emphasize a duty to reach a unanimous verdict but should emphasize a duty to deliberate. 106 *N.J.* at 306 n. 74, 524 *A.*2d 188.

Moreover, defendant's death sentence was returned by a jury fully aware of its sentencing options. As acknowledged by defendant, in concluding its charge the court accurately instructed the jurors that a non-unanimous verdict on punishment would mean imprisonment. In fact, it repeated the phrase, "If you cannot reach a unanimous verdict on the question of punishment, the punishment shall be imprisonment" three times just before the jury retired for deliberations. The court also properly charged: "A decision to disagree as to punishment after due deliberation is permissible since your job is not necessarily to reach agreement but to deliberate." Similarly, this verdict sheet, unlike the verdict sheet in *Hunt* which did not list a non-unanimous life sentence as a possible verdict, properly included all three potential verdicts allowable under the Code.

The court's supplementary instruction did not indicate in any way that the court would be disappointed if the jury returned a non-unanimous verdict. Indeed, the court's supplemental instructions were geared toward achieving precisely what we stated in *Hunt* was the appropriate goal of such instructions: that the jury had deliberated sufficiently to render one of the three verdicts permissible in a capital case. *Ibid.* These instructions lacked even the most minute tendency to coerce the jury into a unanimous verdict. Thus, we find no error in the trial court's supplemental instructions.

## VII. OTHER ISSUES

### A. Unanimity Requirement for Aggravating Factors

Defendant claims here, for the first time, that his death sentence must be reversed because the trial court did not properly instruct the jury that for its verdict to indicate the existence of an aggravating factor, all twelve jurors must unanimously concur in the existence of that factor. Defendant maintains that the instructions suggested that defendant could be put to death if, for example, six of the jurors found one of the aggravating factors and the remaining six jurors found the other aggravating factor. The State disputes defendant's characterization of the court's charge, arguing that it was clearly consistent with the statute. Moreover, the State maintains that any error was clearly harmless, considering the verdict sheet and the court's poll of the jury, both of which establish that the jury unanimously found the murder-for-hire factor.

We agree with the State on both counts. We have no doubt that the jurors understood that the death-penalty statute required a unanimous jury finding to establish the existence of an aggravating factor. *Bey, supra,* 112 *N.J.* at 159, 548 *A.*2d 887. With respect to this issue, the trial court charged the jury:

The evidence relating to mitigating factors should be fully discussed by the jury to the extent reasonably possible. You should by reason attempt to reach an agreement on a question whether a particular factor does or does not exist.

*However the law does not require unanimity with respect to the finding of mitigating factors. Furthermore, each juror must individually determine whether each mitigating factor exists and each juror must individually decide whether the aggravating factor or factors unanimously found outweigh the mitigating factor or factors that the jury has found to be present*

. . . .

*If you individually and unanimously find that the State has proven one or more aggravating factors beyond a reasonable doubt and beyond a reasonable doubt such factor or factors outweigh the mitigating factor or factors that you or more of you found to exist, then the. punishment shall be death.* After a full discussion you cannot reach a unanimous verdict on the question of punishment as to the murder, then in that case the sentence will be imprisonment for the term of years previously described.

[Emphasis added.]

The verdict sheet also clearly set forth the jurors' choices. The relevant portion of the verdict sheet reads as follows:

1. *Aggravating Factors*

Do you unanimously find beyond a reasonable doubt that any of the following aggravating factors exist:

a. [Murder-for-hire]

| | |
|---|---|
| NO | YES |
| (0) | (12) |

b. [Murder to escape detection]

| | |
|---|---|
| NO | YES |
| (1) | (11) |

[1] IF YOU HAVE FOUND THAT NONE OF THE AGGRAVATING FACTORS WERE PRESENT, THE DELIBERATION IS COMPLETE AND THE PUNISHMENT SHALL BE IMPRISONMENT BETWEEN YEARS WITHOUT PAROLE AND LIFE. IF YOU HAVE UNANIMOUSLY FOUND THAT ONE OR MORE AGGRAVATING FACTORS WERE PRESENT, GO TO NUMBER "2" BELOW.)

2. *Mitigating Factors*

Do any of you find that any of the following exist as mitigating factors: (you should note that there is no burden of proof as to mitigating factors. They need only be established by reliable evidence. Unanimity is *not* required.) (IF YOU ARE NOT UNANIMOUS ON A MITIGATING FACTOR BEING PRESENT OR ABSENT INDICATE THE NUMBER OF "NO" AND "YES") VOTES.)

\* \* \* \* \* \* \* \*

3. *Decision of the Jury*

Indicate below *one and only one,* choice which is the decision of the jury.

a. The jury is unanimously satisfied that any aggravating factor or factors proven to exist fail to outweigh the mitigating factor or factors. (The trial judge will sentence the defendant to at least 30 years imprisonment without parole.)

―――

b. The jury is unanimously satisfied beyond a reasonable doubt that any aggravating factor or factors proven to exist outweigh the mitigating factor or factors. (The trial judge will sentence the defendant to death.)

―――

If you have unanimously found more than one factor present, then indicate as to each such factor whether it by itself outweighs the mitigating factors beyond a reasonable doubt:

AGGRAVATING FACTOR "a" NO ( ) . YES (x)
AGGRAVATING FACTOR "b" NO ( ) YES ( )

c. After due deliberation, the jury cannot unanimously agree upon punishment. (The trial judge will sentence the defendant to at least 30 years imprisonment without parole.)

A jury charge must adequately set forth the elements of an offense in a way that explains the law to the jury in an understandable manner. *Martini, supra,* 131 *N.J.* at 271, 619 *A.*2d 1208. In reviewing instructions to the jury, a court must not isolate the language challenged but must examine the remark in the context of the entire charge. *Marshall, supra,* 123 *N.J.* at 145, 586 *A.*2d 85. The effect of the purportedly-erroneous charge must be evaluated in light of the totality of the circumstances. *Ibid.*

The trial court's instructions clearly draw a distinction between mitigating factors concerning which "the law does not require unanimity" and aggravating factors that must be "unanimously found." Read in conjunction with that clear distinction, the court's statement, "If you individually and unanimously find that the State has proven one or more aggravating factors beyond a reasonable doubt . . . ," does not suggest that the twelve jurors did not have to agree that the same aggravating factor was present, so long as they all believed in the existence of some aggravating factor. In fact, the remainder of the sentence to which defendant

points demonstrates that his interpretation is inconsistent with what the court said. Specifically, the trial court continued: "and beyond a reasonable doubt *such factor or factors* outweigh the mitigating factor or factors ... then the punishment shall be death." (Emphasis added.) "[S]uch factor or factors" refers to the aggravating factor or factors unanimously found.

We do not adopt defendant's tortured interpretation of the trial court's instructions. What is more important, the jury itself clearly did not construe the court's words as defendant does. To the contrary, they understood the law correctly: for an aggravating factor to exist, all twelve jurors must find that that factor exists. The completed verdict sheet evidences the jury's understanding of this principle as did the jurors' responses to the court's polling. Considering that defendant failed to object below to the court's charge, we strongly suspect that he too found nothing objectionable in it. Even assuming *arguendo* that the charge was in error, we find the error harmless beyond a reasonable doubt.

## B. Admission of Prior–Bad–Act Evidence

### 1. Facts

Prior to the February 1993 penalty-phase proceeding, defendant moved *in limine* for a ruling barring the prosecution from introducing evidence of defendant's prior bad acts on cross-examination because the defense did not intend to submit good-character evidence in mitigation. The trial court denied the motion, concluding that several of the defense's proposed mitigating factors implicated defendant's character. The court did rule, however, that the State could not introduce prior bad acts to rebut defense's character evidence until defendant actually offered such character evidence. Thus, according to the court's ruling, the State could not introduce evidence concerning the defense's character evidence during its case in chief.

During the penalty-phase proceeding, the State elicited testimony during its case in chief about the circumstances leading up to

defendant's arrest and subsequent confession. The arresting officer, Detective Kukk, related that defendant first came to his attention while he was on routine patrol. He spotted defendant and another man, Anthony Lombardi, on the street where one of the men was striking a woman. On direct examination, Detective Kukk testified that defendant was striking the woman, but on cross-examination he admitted that his written report reflected that Anthony Lombardi was the man who had been striking the woman.

Detective Kukk further testified that defendant fled the scene in a car, and that Detective Kukk chased him through several intersections. During the chase, defendant almost struck a school bus and he committed several traffic violations. Unable to overtake defendant, Detective Kukk abandoned the chase.

Later the same day, based on a tip, Detective Kukk went to defendant's apartment. The car that he had pursued earlier was parked across the street in front of a hydrant. Defendant's mother invited Detective Kukk into the apartment whereupon defendant came out of one of the rooms and yelled at his mother for letting the police into the apartment. Detective Kukk testified that defendant admitted having tried to elude him earlier that day. He also testified that the car that he had identified had been stolen. Detective Kukk did not arrest defendant that day, but told him to turn himself in the next day. Defendant did not turn himself in, and Detective Kukk arrested him a week later at defendant's probation officer's office.

During the cross-examination of Detective Kukk regarding whether defendant or Lombardi had struck the woman, the trial court instructed the jury as follows:

> While [Detective Kukk is] looking for [the written report indicating who had struck the woman], ladies and gentlemen, that would be an example of something that would come in only for a limited purpose. You could not use that incident as relating to the aggravating factors, as making any aggravating factor worse. It can only be considered with any effect it might have or not have on any mitigating factors you present [sic].

After defense counsel had completed the cross-examination of Detective Kukk, he noted for the record that he did not object to Detective Kukk's testimony about the prior bad acts relating to defendant's arrest because counsel assumed that the court had foreclosed such an objection in denying defendant's *in limine* motion on the issue of character evidence. The trial court disagreed with the defense's characterization of its ruling:

> I don't agree with that description of what occurred at all, nor do I agree that that has any relationship with any ruling that I made. The ruling that I made has to do with the State's right to rebut character evidence by way of prior bad acts. It may be, since we're going to get into it anyway, that you don't have an objection whether he does it now or does it at the end. I can understand that. But, if anything, the testimony that came [in] and related to the circumstances under which the initial statement was obtained. Had you objected at the time, I probably would have sustained it at the time as not be[ing] relevant but there was no objection.

In addition to objecting to Detective Kukk's testimony insofar as it related to prior bad acts (theft of automobile, high-speed chase, yelling at mother), defendant maintains that the testimony of Detective Saunders impermissibly caused the jury to know that defendant previously had been involved in a burglary. On redirect examination during the State's case in chief Detective Saunders testified about defendant's formal confession:

> Q. Counsel asked you about the gun that was used. Sir, I direct your attention to page three of the statement, again. Did you ask Mr. DiFrisco on the bottom:
> "Q: Where did you get the gun you used?"
> Can you tell me what Mr. DiFrisco's reply was?
> MS. SOTO: Judge, objection.
> THE COURT: Basis.
> MS. SOTO: May I be heard at sidebar?
> THE COURT: It's already been entered into evidence.
> MS. SOTO: Judge, I think there's—
> MR. LIGUORI: Judge, I think there's portions of the statement that are inappropriate to go into evidence.
> THE COURT: It's already been received in evidence.
> MR. LIGUORI: Well, could I be heard at sidebar?
> MR. BOGDANSKI: Judge, she asked about it.
> THE COURT: Bring the document.
> (The following takes place at sidebar.)

THE COURT: Yes.

MR. LIGUORI: Judge, this contains portions that contain bad acts that they're, at this time, are inadmissible [sic]. They may be later on in the proceeding but I would request that if it goes, Judge, as it is, that be excised or that be covered before it goes into the jury in accordance with your Honor's ruling. Otherwise I think that's a bad act not permitted.

MS. SOTO: And just to let you know in terms of not—I know it's in evidence, but he did not ask the question on direct and that's why at that time we had no objection to the statement being moved because since he didn't ask it, we were going to ask that it be redacted based on the point he wasn't trying to move it in. So we didn't see—

THE COURT: He moved it in without objection. Besides that, it's inadmissible [sic] anyway because it buttresses the question of whether he had a gun and where he got it. The fact that he knows where he got it is certainly evidence. That is admissable [sic].

(The following takes place in open court.)

Q. One question you asked, "Where did you get the gun you used" could you tell us—you probably could tell us better if I gave it back to you. Could you tell me what his answer was at the bottom of that page?

A. "A: I ended up with the gun after two guys, one was Greg Esposito, burglarized a lumbar [sic] yard at 2925 East Tremont Avenue, Bronx, New York, New Eljam Products, Esposito's father owns it. They got caught. It was Christmas of 1985. They had a shotgun and a box of change. I had a box and didn't get caught. The box had the gun with the silencer on it and some change. I got away."

The trial court then gave the jury instructions on how to regard the mention of a prior burglary: "That's being allowed in only for the limited purpose of learning about where the gun was obtained or may have been obtained and you may not consider that evidence as adding to or affecting any of the aggravating factors which the prosecutor is attempting to prove."

Defendant maintains that the court should have ruled both Detective Kukk's and Detective Saunder's testimony concerning prior bad acts inadmissible because (a) the testimony was irrelevant; (b) its prejudicial effect substantially outweighed its probative value; and (c) it was introduced to prove defendant's disposition to commit another crime.

2. *Relevancy*

■ We conclude that both Detective Kukk's testimony describing the events leading up to defendant's arrest of defendant

and Detective Saunders testimony regarding defendant's confession were relevant. One of the mitigating factors submitted by defendant was his alleged voluntary cooperation, and Detective Kukk's testimony concerning the events of defendant's arrest clearly tended to rebut defendant's assertion of voluntary cooperation. As such, the testimony was relevant—that is, it had a tendency in reason to prove or disprove a material fact. *Evid.R.* 401.

Similarly, Detective Saunders' testimony concerning defendant's confession—particularly that aspect of the confession relating to defendant's possession of a gun stemming from a prior burglary—was relevant in that it lent a degree of specificity to defendant's confession that would tend to corroborate the confession. As we recognized in *Di Frisco I, supra,* 118 *N.J.* at 275, 571 *A.*2d 914, corroboration of a confession is vital to establishing aggravating factors behind a reasonable doubt.

### 3. Balancing Probative Value and Potential Prejudice

*Evidence Rule* 403 codifies the now-well-settled rule that even relevant evidence may be excluded if its potential for prejudice substantially outweighs its probative value. Specifically, *Evidence Rule* 403 provides: "Except as otherwise provided by these rules or other law, relevant evidence may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence." "Hence, even if the other-crime evidence is relevant to prove some legitimate trial issue, the trial court must still exclude it unless, under *Evidence Rule* [403], its probative value outweighs its prejudicial impact." *State v. Cofield,* 127 *N.J.* 328, 336, 605 *A.*2d 230 (1992); *see State v. Clausell,* 121 *N.J.* 298, 322, 580 *A.*2d 221 (1990). We accord trial judges broad discretion in applying the balancing test. *State v. Sands,* 76 *N.J.* 127, 147, 386 *A.*2d 378 (1978). Only where we identify "a clear error of judgment" do we disturb a trial court's conclusion with respect to that balancing

test. *State v. Koedatich*, 112 *N.J.* 225, 313, 548 *A.2d* 939 (1988), *cert. denied*, 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.2d* 803 (1989).

We find no error in the trial court's decision to admit both Detective Kukk's and Detective Saunders' testimony. Detective Kukk's testimony was highly probative concerning the issue of defendant's voluntary cooperation with police. Its prejudicial impact was *de minimis* at best. Considering that defendant confessed to the execution-style killing of Mr. Potcher, the fact that he stole a car, committed a few traffic violations, and yelled at his mother had very little tendency to divert the jurors' attention from their duties.

Similarly, the trial court correctly admitted Detective Saunders' testimony. First, the entire confession from which Detective Saunders read had already been submitted into evidence without objection. The confession contained the exact reference to the prior burglary that Detective Saunders related in his testimony. Second, the court twice gave the jury limiting instructions regarding the proper use of the evidence. Third, given the nature of the crime to which defendant pled guilty, the reference to a prior burglary in the context of explaining how defendant came to possess a gun had little prejudicial potential. As previously stated, the evidence was probative in that it tended to establish the consistency and reliability of defendant's confession. Thus, the prejudicial potential did not substantially outweigh the probative value.

### 4. Admissibility of Prior–Bad–Act Evidence

Evidence Rule 404(b) provides:

Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that he acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.

That rule excludes other-crime and prior-bad-act "evidence when offered solely to prove a defendant's propensity to commit crime."

*State v. Stevens,* 115 *N.J.* 289, 300, 558 *A.*2d 833 (1989). The purpose of the rule is to ensure that juries do not convict defendants or, in this case, punish them more harshly because the defendants' prior crimes make the jury perceive them to be bad people in general. *Cofield, supra,* 127 *N.J.* at 336, 605 *A.*2d 230.

Because the list of legitimate purposes for which prior-bad-act evidence is admissible is not exhaustive, *Stevens, supra,* 115 *N.J.* at 300, 558 *A.*2d 833, such evidence is admissible so long as it is relevant to a material issue in dispute and not offered to prove a defendant's disposition. Neither Detective Kukk's nor Detective Saunders' testimony was offered to prove defendant's disposition in a general sense or his disposition to commit murder in particular. Detective Kukk's testimony tended to prove that defendant had not willingly turned himself into the authorities, not that he was a bad person with murderous proclivities. Similarly, Detective Saunders' testimony—a mere reiteration of defendant's confession—tended to prove that defendant's confession was a genuine account of the murder of Edward Potcher and the circumstances surrounding the murder, not that defendant was a bad person for having been involved previously in a burglary.

The testimony of both Detective Kukk and Detective Saunders was relevant, probative, not unduly prejudicial, and appropriately limited by the trial court. In comparison to defendant's confession to a cold-blooded murder for hire, the auto theft and burglary charges could not have prejudiced the jury. Thus, we find no error in the court's decision to admit the testimony in both cases.

## C. Admissibility of Photographs

The State introduced color photographs of the crime scene during the penalty trial. The State also introduced an x-ray photograph of the victim showing the location of three bullets in his body. Defendant argues that the photographs were irrelevant and highly prejudicial and thus should have been excluded.

Photograph S–9 depicted a bullet lodged in some flesh of the victim and a pool of blood. Photograph S–13 depicted a spent shell cartridge near the scene depicted in S–9. Photograph S–24 was an x-ray photograph showing three bullets lodged in the victim's skull. Another photograph to which defendant did not object depicted another bullet lodged in a wall.

According to the State, those photographs corroborated defendant's confession. In particular, the prosecution argued that the photographs bolstered defendant's statement that he fired five bullets (the one depicted in S–9, the three depicted in S–24, and the one associated with the spent shell in S–13). In addition, the photographs, in their depiction of the blood stains and the position of the bullets in the victim, support defendant's statements regarding his and the victim's relative positions during the shooting. Defendant argues that the trial court should have excluded the photographs pursuant to *Evidence Rule* 403 because the prejudicial impact of the blood and the bullets in the victim's head outweighed any probative value associated with the photographs.

The trial court disagreed. It concluded, "I don't find the picture of the blood in and of itself anything that would implicate *Rule* 4 [403]." The court also found that the pictures were relevant because they corroborated defendant's statement that he fired the gun five times. The court subsequently reiterated its ruling,

> [To] prove the aggravating factors he's (the prosecutor) got to do, in this case, everything he can to corroborate the confession. These photos are clearly corroborative of the confession and I am absolutely satisfied that they don't create any danger, let alone a substantial danger of any prejudice to the defendant. There's no person even in the pictures, just blood. The purpose of it is to show that the shells were found.

 Although we recognize the critical "need to balance the ostensible relevance of such evidence against the likelihood of jury prejudice," *State v. Bey,* 129 *N.J.* 557, 609, 610 *A.*2d 814 (1992), we continue to review a trial court's admissibility ruling under the abuse-of-discretion standard. *State v. Moore,* 113 *N.J.* 239, 295, 550 *A.*2d 117 (1988).

Because corroboration of defendant's confession was critical to the State's case, the photographs were highly probative. The prejudicial impact associated with the large amount of blood in displayed by the photographs did not substantially outweigh the strong tendency the photographs had to corroborate defendant's confession. The presence of blood and gruesome details are not *ipso facto* grounds for exclusion. *See Savage, supra,* 120 *N.J.* at 632–33, 577 *A.*2d 455 (upholding admissibility of photographs of victim's dismembered torso); *State v. McDougald,* 120 *N.J.* 523, 567, 580–83, 577 *A.*2d 419 (1990) (upholding admissibility of photographs of couple's slashed and bludgeoned bodies); *Moore, supra,* 113 *N.J.* at 295, 550 *A.*2d 117 (upholding admissibility of photographs depicting sizeable bloodstains); *State v. Conklin,* 54 *N.J.* 540, 545, 258 *A.*2d 1 (1969) (upholding admissibility of photograph of nude, bloodied body). Moreover, the x-ray photograph was not inflammatory at all. Thus, we find no abuse of discretion in the trial court's decision to admit the photographs.

### D. *Submission of Aggravating Factor (f)*

Defendant claims that the trial court erroneously submitted to the jury aggravating factor (f): the murder was committed for the purpose of escaping detection for another offense committed by another (here Franciotti). He argues that sufficient indicia of reliability did not exist to support the hearsay statement contained in defendant's confession, which gave rise to the submission of that factor. Defendant confessed that a man named Franciotti paid him money to kill Potcher because Potcher was going to "rat on" Franciotti and his associates. The aspect of the confession concerning Potcher implicating Franciotti in criminal activity formed the basis of the State's submission of aggravating factor (f). Defendant maintains that because the State failed to show the underlying crime for which Franciotti meant to avoid detection by having Potcher killed, the submission of aggravating factor (f) was reversible error.

We disagree. The record was sufficient for a reasonable jury to conclude that defendant had murdered Potcher because Potcher was about to alert the authorities to Franciotti's criminal activity. Although the defense did establish that no investigation of Franciotti was in progress, the State did provide evidence that Franciotti had had a long involvement in criminal activity.

Moreover, the State presented substantial evidence corroborating defendant's confession. In accordance with our opinion in *Di Frisco I, supra,* the trial court instructed the jury that for the State to carry its burden of proving an aggravating factor beyond a reasonable doubt, it had to produce independent evidence of the aggravating factor *or* it had to corroborate defendant's confession sufficiently. Here, the State did both.

Defendant argues that at most the State proved that defendant believed that he killed Potcher to stop Potcher from implicating Franciotti in criminal activity. Proof of his subjective belief, argues defendant, is insufficient to establish aggravating factor (f). According to defendant, to establish aggravating factor (f), the State must show that the actual purpose for the murder was to escape detection for another crime. If no other crime actually existed for which one would want to avoid detection, the court cannot submit aggravating factor (f). The State argues that *N.J.S.A.* 2C:11–3c(4)(f) only requires a showing of subjective intent—*i.e.,* the murderer believed that a purpose of the murder was to avoid detection of the murder's own crime or of another's crime. The trial court concluded that the State had to demonstrate that one of defendant's purposes in murdering Potcher was to prevent Potcher from implicating Franciotti in actual criminal activity.

In *Martini, supra,* 131 *N.J.* at 279, 619 *A.*2d 1208, we upheld the submission to the jury of aggravating factor (f) based mainly on Martini's confession. In so doing, we rejected Martini's contention that the State must produce direct evidence of a defendant's intention to avoid apprehension to support the factor. *Id.* at 282, 619 *A.*2d 1208. Similarly, here, defendant's confession was

sufficiently corroborated for the State to establish that Franciotti had actually been involved in criminal activity and that DiFrisco had murdered Potcher to prevent Potcher from implicating Franciotti in that activity. Hence, we need not decide whether a mistaken belief on the part of a murderer that the murder was committed to prevent detection for another crime is sufficient to establish aggravating factor (f). In other words, we need not address here whether a hired killer's mistaken belief that his or her target had to be killed because the target was about to implicate some of the killer's associates in criminal activity establishes aggravating factor (f).

 Even if the trial court's submission of aggravating factor (f) was in error, the error would have been harmless because the jury did not find aggravating factor (f) unanimously. The jury, however, did find aggravating factor (d) (murder for hire) and also found that that factor alone outweighed the mitigating factors beyond a reasonable doubt. We noted in *Rose, supra,* 112 *N.J.* at 533, 548 *A.*2d 1058, that in view of the nature of the weighing process in the penalty phase of a capital prosecution, "it would be highly speculative to conclude that the erroneous submission to the jury of aggravating factor c(4)(c), a factor rejected by the jury, prejudicially affected [the] jury's deliberations concerning the remaining aggravating factors, the mitigating factors, and its weighing process." Unlike an erroneous submission that presents a jury with mutually exclusive choices, *see State v. Christener,* 71 *N.J.* 55, 66, 362 *A.*2d 1153 (1976), the erroneous submission of an aggravating factor "neither compels nor inhibits [a jury's] determination that another factor exists." *Rose, supra,* 112 *N.J.* at 533, 548 *A.*2d 1058. Thus, the submission of aggravating factor (f) was harmless.

## E. Exclusion of Proposed Mitigating Factors

 At various points in the penalty-phase proceeding, defendant sought to introduce two specific factors under the statutory "catch-all" mitigating factor, *N.J.S.A.* 2C:11–3(c)(5)(h). Specifical-

ly, defendant sought to introduce as a mitigating factor the fact of the State's failure to prosecute Franciotti and also the devastating emotional effect that defendant's execution would have on his mother. The trial court denied defendant's request to introduce those two factors under the "catch-all" category, holding that neither related to defendant's character or record or to the circumstances of the offense as defined by this Court in *State v. Gerald,* 113 *N.J.* 40, 549 *A.2d* 792 (1988).

We agree with the court's ruling. The "catch-all" category, *N.J.S.A.* 2C:11–3c(5)(h), permits a capital defendant to introduce "[a]ny other factor which is relevant to the defendant's character or record or to the circumstances of the offense." The "catch-all" category tracks the language of the Supreme Court's decision in *Lockett v. Ohio,* 438 *U.S.* 586, 604, 98 *S.Ct.* 2954, 2964–65, 57 *L.Ed.2d* 973, 990 (1978), in which a plurality of the Court held that the federal Constitution

> require[s] that the sentencer, in all but the rarest kind of capital case, not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.[3]

Although the *Lockett* Court recognized that the Constitution affords capital defendants wide latitude in introducing mitigating factors, the Court warned that "[n]othing in [its] opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of the offense." *Id.* at 604 n. 12, 98 *S.Ct.* at 2965 n. 12, 57 *L.Ed.2d* at 990 n. 12.

In *State v. Davis,* 96 *N.J.* 611, 620, 477 *A.2d* 308 (1984), we acknowledged that the statutory "catch-all" factor was necessarily broad in scope, allowing the defendant to introduce expert testimony regarding his potential for rehabilitation as compared to the rehabilitative potential of similarly-situated defendants. Yet, in

---

3 A majority of the Supreme Court subsequently reaffirmed the *Lockett* requirement. See *Eddings v. Oklahoma,* 455 *U.S.* 104, 110, 102 *S.Ct.* 869, 874, 71 *L.Ed.2d* 1, 8 (1982).

*Gerald, supra,* although we reaffirmed our general position that the scope of the "catch-all" factor was broad, we recognized that it was not unlimited. 113 *N.J.* at 103, 549 *A.*2d 792. We held that the sentences received by the co-defendants "plainly [were] not relevant to either Gerald's character or record." *Ibid.* In addition, we held that the sentences received by the co-defendants were not relevant to the "circumstances of the offense." *Ibid.*

"We [were] satisfied that the phrase 'circumstances of the offense' [was] limited in its application to the circumstances surrounding the commission of the crime itself." *Id.* at 104, 549 *A.*2d 792. For example, a defendant's relative degree of participation in the crime is a circumstance of the offense. *Ibid.* The sentence imposed on a co-defendant, however, is peculiar to the co-defendant and has nothing to do with the circumstances of the offense and the defendant's involvement therein. *Ibid.*

Similar to a sentence received by a co-defendant, the State's decision not to prosecute a co-conspirator is wholly unrelated to a defendant's character or record. Moreover, the State's failure to prosecute a co-conspirator does not implicate the "circumstances of the offense prong" as defined in *Gerald,* because it is irrelevant to the "circumstances surrounding the commission of the crime itself." *Ibid.* The failure to prosecute a suspect generally reflects the State's determination of the seriousness of the offense and the probability of conviction. In this case, the State was convinced that it could not successfully prosecute Franciotti because no one would testify against him.

The post-*Gerald* cases cited by defendant in support of his argument that the trial court should have permitted the jury to consider the State's failure to prosecute Franciotti as a mitigating factor under the "catch-all" category are inapposite. In *Parker v. Dugger,* 498 *U.S.* 308, 111 *S.Ct.* 731, 112 *L.Ed.*2d 812 (1991), the Supreme Court reversed a Florida death sentence and remanded the case for a proper weighing of aggravating and mitigating factors. The issue before the Court was whether the trial court had found any non-statutory mitigating factors, including the

sentences received by co-defendants. *Id.* at 313–14, 111 *S.Ct.* at 735–36, 112 *L.Ed.*2d at 821–22. The Supreme Court determined that the trial court had found non-statutory mitigating factors, which should have been weighed against the aggravating factors. Under Florida law, defendants may present any mitigating evidence, regardless of whether it relates to the defendant's character, record, or the circumstances of the offense. *Songer v. State*, 365 *So.*2d 696, 700 (Fla.1978), *cert. denied*, 441 *U.S.* 956, 99 *S.Ct.* 2185, 60 *L.Ed.*2d 1060 (1979). Therefore, the Supreme Court's determination that the trial court found Parker's co-defendants' sentences to qualify as a non-statutory mitigating factor is irrelevant for the purposes of construing the limits of our "catch-all" mitigating factor.

In *Richmond v. Lewis*, 506 *U.S.* ——, 113 *S.Ct.* 528, 121 *L.Ed.*2d 411 (1992), the Supreme Court, in its recitation of the facts, noted that an Arizona trial court had found that the State's failure to prosecute another person involved in the crime was a mitigating factor. *Id.* at ——, 113 *S.Ct.* at 533, 121 *L.Ed.*2d at 418. The opinion contains no further reference to or discussion of the Arizona court's finding. Thus, at most, *Richmond* reflects the Supreme Court's understanding that some jurisdictions consider the more advantageous treatment of co-defendants, co-conspirators, or accomplices as a mitigating factor. When we decided *Gerald*, we too were aware that some other jurisdictions consider a co-defendant's sentence or the State's failure to prosecute an accomplice or co-conspirator to be a mitigating factor. See 113 *N.J.* at 105, 549 *A.*2d 792. As it was then, the law in those jurisdictions is irrelevant to the construction of our capital punishment statute.

With regard to defendant's attempt to introduce as a mitigating factor the potential that defendant's "execution would cause excessive emotional hardship to his mother since she had already lost one son," we conclude that the "catch-all" category does not encompass such a factor. It neither relates to defendant's character or record, nor to the circumstances of the offense,

but rather focuses on the potential impact on a third party. Its exclusion was entirely proper.

### F. Exclusion of Siblings' Pleas for Mercy

Defendant argues that the trial court erred in refusing to allow defendant's two siblings to ask the jury to spare his life. The trial court determined that the defense could offer one witness to plead for mercy on defendant's behalf. The defense ultimately had defendant's mother ask the jury to spare defendant's life.

In *Moore, supra,* 122 *N.J.* at 479–80, 585 *A.*2d 864, we held that the decision to exclude testimony of witnesses pleading for mercy for a defendant "was within the discretion of the trial court." We noted that the trial court might allow Moore's mother to ask the jury for mercy, so long as her plea for mercy "was not cumulative." *Id.* at 480, 585 *A.*2d 864. Our conclusion was shaped by our recognition of the following: (1) capital defendants have the constitutional right to present evidence relevant to any aspect of their character or record and any of the circumstances of their crime in a capital sentencing proceeding; *Lockett, supra,* 438 *U.S.* at 604, 98 *S.Ct.* at 2964, 57 *L.Ed.*2d at 989; (2) a witness's plea for mercy is not relevant to any aspect of a defendant's character or record or to the circumstances of a capital defendant's offense; (3) although not relevant, a capital-sentencing court may, at its discretion, admit the testimony of close family members pleading for mercy if they are also testifying about relevant facts to avoid allowing the jury to infer that the witness does not wish the jury to have mercy on the defendant; and (4) a trial court's discretion in admitting mercy plea testimony from close family members should be limited by concerns for cumulativeness. *See* 122 *N.J.* at 479–80, 585 *A.*2d 864.

Although we may not agree with the trial court's decision to prohibit defendant's two siblings from asking the jury to have mercy on him, that decision was well within the bounds of the

court's discretion. Thus, we find no error in the trial court's ruling.

### G. Extrinsic Corroboration of Aggravating Factors

Defendant asks us to review our decision in *Di Frisco* I. As mentioned previously, we there held that the State could satisfy its burden of proving aggravating factors beyond a reasonable doubt by introducing evidence corroborating defendant's confession. 118 *N.J.* at 275, 571 *A.2d* 914. We held that the State need not introduce extrinsic evidence that independently corroborated the aggravating factors presented and that a corroborated confession could be sufficient proof of the aggravating factors. *Id.* at 275, 571 *A.2d* 914. We adhere to the same view today and accordingly decline to revisit our decision in *Di Frisco* I.

### H. Cumulativeness of Errors

Defendant argues that the trial court's errors in their aggregate warrant reversal of his death sentence. *See State v. Orecchio,* 16 *N.J.* 125, 129, 106 *A.2d* 541 (1954) (noting that where "legal errors * * * in their aggregate have rendered the trial unfair, our fundamental constitutional concepts dictate the granting of a new trial before an impartial jury"). As we have previously stated, we are convinced that the trial court's failure to exclude juror Dawson for cause was rendered harmless by the defense's peremptory challenge of Dawson. Furthermore, the exhaustion of defendant's peremptory challenges was harmless because no one who ultimately sat on the jury was partial. In addition, we find that the trial court's failure to instruct the jury on defendant's statement in allocution in no way prejudiced defendant.

We are also convinced that those errors in their aggregate did not contribute to an unjust result or deprive defendant of a fair trial. " 'A defendant is entitled to a fair trial but not a perfect one.' " *Martini, supra,* 131 *N.J.* at 321, 619 *A.2d* 1208 (quoting *Lutwak v. United States,* 344 *U.S.* 604, 619, 73 *S.Ct.* 481, 490, 97 *L.Ed.* 593, 605 (1953)).

### I. *Constitutionality of the Act*

Defendant argues that the death-penalty statute violates the prohibition against cruel and unusual punishment contained in the Eighth Amendment by failing adequately to narrow the class of defendants eligible for death and by failing to provide for sufficient review. We rejected that argument in *Ramseur, supra,* 106 *N.J.* at 182–90, 524 *A.*2d 188, and have repeatedly reaffirmed that rejection. See *Martini, supra,* 131 *N.J.* at 221–22, 619 *A.*2d 1208 (citing numerous cases holding same). We have no reason to depart from our consistently-held position that the death penalty is constitutional on its face, and we find it to have been constitutionally applied to defendant.

## VIII. CONCLUSION

Defendant's death sentence is affirmed. We acknowledge defendant's request for proportionality review. The matter will proceed according to a briefing and argument schedule to be established by the Clerk of this Court.

HANDLER, J., dissenting.

Today's decision marks the second time this Court has reviewed a sentence of death imposed on Anthony DiFrisco. This is the fourth time the Court has sustained the imposition of the death penalty. Regretfully, its decision does nothing to clarify the confusion or to harmonize the inconsistencies of the Court's capital-murder jurisprudence. Indeed, the opposite is true—the implausibility and incomprehensibility of the Court's treatment of capital-punishment only worsens. The Court continues to strain to achieve the impossible: a constitutionally-valid administration of the death penalty. *See State v. Ramseur,* 106 *N.J.* 123, 524 *A.*2d 188 (1987) (Handler, J., dissenting).

DiFrisco was tried, convicted, and sentenced to death for the 1986 contract killing of Edward Potchner. DiFrisco confessed to his part in the killing of Potchner after being stopped by police for reckless driving. On the advice of counsel, DiFrisco pled guilty to

purposeful and knowing murder. On the strength of his confession alone, defendant was sentenced to death. Although affirming his conviction, this Court vacated his death sentence and remanded for a new penalty trial. *State v. Di Frisco* [I], 118 *N.J.* 253, 571 *A*.2d 914 (1990).

Prior to the start of his second penalty trial, DiFrisco twice sought unsuccessfully to withdraw his guilty plea. Following the second penalty trial, defendant was again sentenced to death. On this appeal, defendant points to several egregious errors in his second penalty trial.

To affirm defendant's sentence the Court explains away serious errors. The Court's failure to assign error where it is clearly warranted is troubling enough, but even more disturbing is the utterly unconvincing manner in which the Court reasons to its conclusions.

I

The most arresting of the errors occurring in DiFrisco's penalty trial arises out of the confusion that surrounded the jury's aborted attempt to return a verdict. The record plainly reveals that the trial court failed to exercise the proper degree of control and direction in its handling of the now-disputed verdict, and, as a result, defendant irretrievably lost the opportunity to have his life spared through the return of a non-unanimous verdict.

A.

Consonant with our decisions in *State v. Hunt*, 115 *N.J.* 330, 382–83, 558 *A*.2d 1259 (1989), and *State v. Ramseur*, 106 *N.J.* 123, 301, 524 *A*.2d 188 (1987), the trial court instructed the jury that a non-unanimous verdict resulting in a life-sentence was an entirely appropriate outcome. In addition, the verdict-sheet handed to the jury set forth the possibility of a non-unanimous, life verdict.

After four hours of deliberation, over two days, the jury, without inquiry from the court, indicated that it had reached its verdict.

After the jury had been assembled in the court room, the trial court asked the foreman, "Mr. Foreman, the jury has reached a verdict. Is that correct?" The foreman responded, "Yes." The court then asked, "Are the verdicts unanimous?" The foreman responded, "No, its not." As is customary, the court then proceeded to inquire about the jury's findings with respect to the particularized aggravating and mitigating circumstances. The court began to ask specifically whether the jury had found unanimously the "murder for hire" aggravating factor. Instead of responding to the question, the foreman stated, "We have to go back." Additionally, juror 9 blurted out, "We have to go back, we didn't complete the entire list. We didn't unanimously decide on that." Assuming, quite reasonably given the context, that the jury had failed to complete the verdict form, the court sent them back with the instructions, to "[f]ill in the verdict form. Just remain, we'll wait."

After the jury retired with instructions to complete the verdict sheet, the trial court apparently began to have second thoughts. Although we cannot know the precise course of the court's reasoning, apparently the court believed that it should have told the jury to continue deliberating. The court made the following statement:

> In reconsidering my suggestion that the jury go back and fill out the verdict form, I think that's not in accordance with *State v. Ramseur*, 106 *N.J.* 123 [524 *A.*2d 188] or *State v. Hunt*, 115 *N.J.* 330 [558 *A.*2d 1259]. The jury indicated that their verdicts were not unanimous. If that's referring to the ultimate verdict, they have only been out about four-and-a-half hours all together and its clear to me under *Hunt* and *Ramseur* that at the very least where they have not sent out a note indicating they were deadlocked, further deliberations should take place. So I'm inclined to bring them out and tell them that.

When it called the jury back into the court room, the court posed the confused state of affairs as follows:

> Mr. Foreman, my first question to you, I guess, was whether the jury had reached a unanimous verdict and in asking that question I intended to be referring to the last page, namely the decision of the jury. You had indicated, I am not sure whether my statement or question was clear, but you had indicated that the jury had not reached a unanimous agreement. *With respect to the situation as it stands now, the question would be, whether you had deliberated sufficiently and had reached a genuine stalemate with respect to the question of what the verdict should be or whether further deliberations would be productive. So I want you to*

*return to your deliberations and consider that. Okay, you may return to your deliberations.* (emphasis added)

Having asked the relevant question, the court did not pause for an answer. It admitted the possibility that the jury had in fact intended to return a non-unanimous verdict, but having decided that such a verdict would not be accepted anyway, the court sent them back to deliberate further. An hour and a half later, the jury returned a unanimous, death verdict.

Further insight into the court's uncertainty is gleaned from its statements denying defense counsel's motion to set aside the capital verdict:

> The transcript is absolutely clear that the jury did not indicate an inability to reach a verdict. In fact what the jury said was they had reached a verdict. When I asked whether the verdicts were unanimous, they said no. But, of course, that was an ambiguous statement because of all the—because of the writings on the verdict form indicated partial votes with respect to all the mitigating factors and could not necessarily agree with respect to the aggravating factors. When I asked them whether they unanimously found the first aggravating factor, their response was, not me, their response was, "Mr. Foreman, we have to go back." They're the ones who wanted to go back and the only question I put to them was hardly coercive of getting a verdict. The only question I put to them was, "Would you let me know whether you had reached the final verdict or a final inability to reach a verdict and let me know." The next thing they do is reach a verdict. This doesn't come close to an inappropriate conduct under *Ramseur* or *Hunt,* therefore, the motion is denied.

The inescapable fact is that the jury's initial attempt to return a verdict was mishandled by the trial court.

## B.

I have no doubt that *the jurors thought that they had reached a verdict.* They reported from the jury room to the court that they had done so, and responded unequivocally in the affirmative to the court's question, "The jury has reached a verdict. Is that correct?" If, as the majority suggests, the jury had not reached a verdict, *ante* at 485, 645 *A.*2d at 760, then their actions indicate that they fundamentally misunderstood the proper procedures to be followed in their deliberations and in reporting their decision.

In addition, I have no doubt that *some aspect* of the jury's intended verdict was non-unanimous. In response to a direct question, the foreman said so. No one knows, for sure, whether the non-unanimous portion was the final, overall verdict, a finding on an aggravating factor, or a finding on a mitigating factor. The trial court never ascertained the locus of the non-unanimity.

The jury clearly had not complied exactly with the trial court's original instructions. The foreman and juror nine's statement, "We have to go back," was an indication that something had been left undone. The jury could have fully deliberated on all the issues, reached an overall non-unanimous determination, but could have merely neglected to complete the ministerial act of filling in the verdict sheet. At least initially, that is what the trial court thought had happened. It returned the jury to the deliberation room to fill out the verdict sheet.

Juror nine's statement could lead one to conclude that the jury had not deliberated on the murder-for-hire aggravating circumstance. If that is so, one must also conclude that the jury, in returning to the courtroom to announce its verdict totally misunderstood the court's instruction regarding the requirements needed to return a final verdict, *i.e.,* the jury would have had to find and weigh the aggravating and mitigating factors *before* reporting a verdict. Even if one accepts the majority's assessment of the jurors' statements, "We have to go back" as a request to return, not simply to record their final verdict on the verdict sheet but to continue their deliberations, *ante* at 484, 645 *A.*2d at 760, and thus an indication that the jury was not deadlocked, that interpretation does not overcome the apparent confusion of this jury over how to deliberate and report its findings.

In sum, the record reveals that either the jury sought to return a final non-unanimous verdict but neglected to fill out the verdict sheet and were prevented from doing so by the trial court, or they incorrectly thought they should report a verdict even though it was not final, thus failing to comply with the steps necessary to

reach a verdict in a capital cause. We will never know which scenario is accurate. Yet either requires reversal.

The majority, however, seizes on one set of those possible explanations to ground its conclusion that no harm was done to defendant despite the confusion surrounding the jury's initial verdict. In so doing, the majority unfairly resolves all doubt in favor of the State. That simply is not tolerable in any criminal matter, let alone a capital case. Too much is at stake for the Court to grasp onto but one of several explanations concerning what occurred. Moreover, the explanation on which the majority does rely is unconvincing. It is no more than conjecture.

The key to the entire question, according to the majority, lies in the jury's request to return to its deliberation as evidenced by the foreman's and juror nine's statement to the court, "We have to go back." *Ante* at 484, 645 *A.*2d at 760. The majority concludes, "the foreman's response ... was *most likely* an indication of the non-unanimity of the jurors with respect to one of the aggravating factors and many of the mitigating factors." *Ibid.* (emphasis added). On that highly strained and selective reading of the jurors' statements, the majority hangs all its legal analysis and attempts to distinguish both *Ramseur* and *Hunt.*

In *Ramseur,* the decision of this Court that unqualifiedly established the legitimacy of a non-unanimous life verdict in a capital case, the jury sent a note to the trial court stating, "Jury unable to reach a unanimous decision. Suggestions please." 106 *N.J.* at 301, 524 *A.*2d 188. The Court determined that the phrase "Suggestions please" indicated that the jury had not reached a final non-unanimous verdict. *Id.* at 302, 524 *A.*2d 188. The *Ramseur* Court analogized the situation before it to *Jones v. State,* 381 *So.*2d 983 (Miss.) *cert. den.,* 449 *U.S.* 1003, 101 *S.Ct.* 543, 66 *L.Ed.*2d 300 (1980), in which the jury sent a note stating, "We the jury cannot come to a unanimously [sic] decision—What shall we do?" *Ramseur,. supra,* 106 *N.J.* at 303–04, 524 *A.*2d 188. The majority suggests that the juror's statements "We have to go

back" are the functional equivalent of "Suggestions please" or "What shall we do?" That assertion is implausible.

First, this jury, unlike the jury in *Ramseur*, had been explicitly instructed that a final non-unanimous, life verdict was perfectly acceptable.[1] Second, this jury, unlike the jury in *Ramseur*, did not announce that it was dead-locked but rather that it had reached a *verdict*. Finally, as noted, the spontaneous statements "We have to go back" are susceptible of several interpretations, the least plausible of which is the majority's. No one knows what the jurors meant because the trial court did not ask.[2]

The majority also attempts to distinguish *Hunt* by selectively reading "We have to go back" as an expression of a desire to continue deliberating on the ultimate, life or death, issue. *Ante* at 487, 645 *A*.2d at 762. The majority straight-facedly asserts that "We have to go back" indicates that "this jury was positive that it wanted to continue its work," and therefore "the court was under no obligation to inquire whether the jurors had reached a final impasse because obviously they had not." *Ibid.* The majority does not satisfactorily explain why the "work" the jury sought "to continue" was not the filling out the verdict sheet to record their non-unanimous verdict. It overlooks the plain fact that the trial court itself thought that that was a clear possibility. In denying defense counsel's motion to vacate the capital verdict, the court claimed that the only question it had posed to the jury was whether they had reached a final non-unanimous verdict or wheth-

---

[1] In the original charge to the jury in *Ramseur*, the trial court did "inform the jury of the consequences of a non-unanimous verdict." 106 *N.J.* at 305, 524 *A*.2d 188. That contradicts sharply with the affirmative instruction given to this jury, "A decision to disagree as to punishment after due deliberation is permissible since your job is not necessarily to reach agreement but to deliberate."

[2] Even though ultimately determining that requiring the *Ramseur* jury to deliberate further was not error, this Court there noted, that the "trial court should have explored with the jury whether it had deliberated sufficiently and had reached a genuine stalemate, a point at which further deliberation would have been counter productive." 106 *N.J.* at 304, 524 *A*.2d 188.

er they needed more time to deliberate. The jury's disposition certainly was not "obvious" to the trial court. How can it be so to the majority?

Common sense and fairness dictate that a court has a duty to inquire whether a jury has reached a final non-unanimous verdict *whenever there is ambiguity. Hunt, supra,* 115 *N.J.* at 380, 558 *A.*2d 1259 ("[T]he trial court should have asked whether the jury's note indicated its final verdict or whether the jury wanted more time to deliberate.") (citing *Lowenfield v. Phelps,* 484 *U.S.* 231, 240, 108 *S.Ct.* 546, 552, 98 *L.Ed.*2d 568, 579 (1988).) The majority's assertion that no ambiguity clouded this situation is a wishful interpretation that is wholly unfair to defendant.

## C.

Even accepting the majority's own explanation of what happened, this case reveals a jury that badly misunderstood the proper form for its deliberation. According to the majority, this jury precipitously and erroneously reported to the court that it had reached a verdict when in fact it had not. *Ante* at 485, 645 *A.*2d at 760 ("What is clear ... is that the jury did not view itself as having reached one of the three permissible verdicts....)" According to the majority (and arguably juror nine) this jury was prepared to render a verdict without reaching a unanimous decision on the "murder for hire" aggravating factor. *Ante* at 485, 645 *A.*2d at 761 ("[T]he foreman's response ... was most likely an indication of non-unanimity of the jurors on one of the aggravating factors and many of the mitigating factors."). Further, according to the trial court, this is a jury that disregarded instructions to deliberate on the question of whether they had reached a final non-unanimous verdict or whether they needed more time, and proceeded to deliberate on the ultimate issues. Almost as an after-thought, the majority acknowledges that "it would have been better if the court had explored with the jury the reason for its own request to return to the jury room." *Ante* at 485, 645 *A.*2d at 761. Yet this is the same jury which, according to the majority,

needed no supplemental instruction after its aborted attempt to return a verdict. *Ante* at 489, 645 *A.*2d at 762.

The majority's mistake is in focusing exclusively on the coercive propensity of the trial court's interaction with the jury after its attempt to return some form of a verdict. The proper focus should be on the apparent confusion of the jury and the total absence of any guidance for the jury through supplemental instructions. Faced with an obviously confused jury, the trial court allowed them to return to deliberations without additional instructions. The majority insists that the trial court did "nothing that was coercive." In that, the majority is only partially correct: the trial court did nothing.

To vindicate the constitutional norms that legitimate the imposition of a death sentence, both our Capital Murder Act and the decisions of this Court lay considerable stress on the quality of the deliberative environment in which a capital jury makes its life-and-death determinations. The deliberative environment of a capital jury is carefully structured. The maintenance of that environment, including the giving of clear and complete instructions and assessing the jury's compliance with those instructions, is among the most challenging tasks facing trial courts in capital cases.

To no small degree the constitutionality of a given death sentence depends upon the quality of the jury's deliberative environment. *See State v. Collier,* 90 *N.J.* 117, 122, 447 *A.*2d 168 (1982) (noting a defendant's right to a "jury verdict free from untoward interference from any source, including the court"). The indispensable mechanism for creating that environment is the trial court's jury instructions. Likewise, the primary mechanism for salvaging that environment when it has evidently broken down is the prompt use of supplemental jury instructions. Although the use of a supplemental charge is fraught with potential danger, *see State v. Czachor,* 82 *N.J.* 392, 413 *A.*2d 593 (1980) (detailing the coercive propensities of the so-called *Allen*-charge, from *Allen v. United States,* 164 *U.S.* 492, 17 *S.Ct.* 154, 41 *L.Ed.* 528 (1896)), the

failure to re-instruct an obviously confused jury is equally risky. The failure to provide a needed supplemental charge can be fatal to the integrity of a capital jury's deliberations. When a jury is the final sentencer, "it is essential that the jurors be properly instructed regarding all facets of the sentencing process." *Walton v. Arizona*, 497 *U.S.* 639, 653, 110 *S.Ct.* 3047, 3057, 111 *L.Ed.*2d 511, 528 (1990).

Among the more prominent complicating features of a capital penalty trial is the possibility of a non-unanimous verdict. The non-unanimous, life-verdict option, provided by the Legislature, see *N.J.S.A.* 2C:3c(3)(c), reflects the heightened concerns for fairness and the need for reliability in a jury's capital-sentencing determinations. " 'As long as one juror believes that the aggravating factors do not out-weigh the mitigating factors, the jury must not impose the death penalty'." *Hunt, supra,* 115 *N.J.* at 383, 558 *A.*2d 1259 (quoting *Mills v. Maryland,* 486 *U.S.* 367, 374, 108 *S.Ct.* 1860, 1865–66, 100 *L.Ed.*2d 384, 393–95 (1988)). Accordingly, we have held that jurors must be informed of the consequences of their deliberations, including the consequences of their inability to agree. *Ramseur, supra,* 106 *N.J.* at 312, 524 *A.*2d 188. Moreover, we have held that a deadlocked jury that indicates that its non-unanimity is not a final verdict should be reminded of its option of returning a non-unanimous verdict before being dispatched to deliberate anew. *Hunt, supra,* 115 *N.J.* at 385, 558 *A.*2d 1259.

Even accepting the majority's highly implausible reading of the jury's aborted attempt to return a verdict, *i.e.,* that their non-unanimity was not an expression of a final non-unanimous verdict, *ante* at 485, 645 *A.*2d at 760, the fact remains that the trial court should have re-instructed the jury concerning its option to return a non-unanimous verdict.

### D.

Because the trial court failed to ascertain whether the jury had reached a final non-unanimous life verdict, and because this Court

has no ability to divine which of several potential explanations of what happened is accurate, its conclusion that a non-unanimous verdict was not lost is pure speculation. Defendant's death sentence cannot be based on guess-work, and must be reversed.

Even if it were possible to determine conclusively that the jurors statements "We have to go back" indicated a desire to resume deliberation on the ultimate issues of life or death, the jury had manifested confusion over the most critical aspect of its responsibilities—reaching and returning a verdict. The trial court never cleared up the confusion or dispelled the ambiguity of the jury's actions. The trial court's failure to re-instruct this jury permitted defendant's life to swing in the balance, and that failure is, itself, reversible error.

## II

The majority rejects as harmless the trial court's error in refusing to instruct the jury that defendant's allocution could be considered in its deliberations about punishment. *Ante* at 480, 645 *A*.2d at 758. In so doing, the majority, although conceding defendant's right to have the jury consider his allocution in its determination of mitigating factors, denies him the right to an instruction that would so inform the jury. More egregiously, the majority rationalizes its conclusion by resorting to harmless-error analysis, which substitutes the speculations of an appellate court for the reasoned consideration of a jury, and which is wholly inappropriate in the penalty phase of a capital case.

During the trial court's initial instructions to the jurors before opening statements, it advised them that their decision on the facts could be based only on "evidence as presented during the trial," which the court defined as "the testimony of witness and such exhibits and documents as they may come into evidence."

At end of the presentation of evidence, after defendant had informed the court that he desired to exercise his right of allocution, the trial court again addressed the jury:

Members of the jury, under our law a defendant in a case such as this is entitled to what we call a right of allocution. *It is not an exercise of testifying,* it is a right to speak to the jury and I had explained to Mr. DiFrisco what the limits are with respect to that and his remarks will be within those limits. It will be a brief discussion to you. Please give him your attention. You may address the jury sir.

(Emphasis added).

Then defendant spoke:

Thank you, your Honor.

Ladies and gentlemen of the jury, I am deeply, deeply sorry for taking the life of Mr. Potcher. I'm equally sorry for his family as well as mine. I ask you and I plead with you to spare my life, not to give me the death penalty. Thank you. Thank you all.

The prosecutor then sought a ruling from the court on whether counsel could comment on defendant's allocution during summation. The trial court ruled that neither the prosecutor nor the defense counsel could comment on defendant's allocution because it was not evidence. In the midst of the discussion of that issue, the topic of instructions on allocution arose in the following confusing colloquy.

Court: It would follow from what you're saying, wouldn't it, that I should charge the jury with respect to [mitigating factor] O, Anthony DiFrisco remains remorseful about killing Edward Potcher, that as a mitigating factor they may not consider his statement in allocution.

1st Def. Atty: Well, we object to that, Judge. We don't believe that either. We think that that should be left—that you should not say you can't consider the allocution. We would object to that.

2nd Def. Atty: I mean, I don't think anything in addition to the allocution charge which says that, as I understand it, says it's not evidence and the jurors will know that that's not evidence and then it should be applied that way. There's nothing more additional than the allocution charge we already discussed.

Court: There is no allocution charge.

2nd Def. Atty: I'm sorry, reference to it in the charge. There's nothing.

The next day, the prosecutor then sought the limiting jury instruction the court had suggested, an instruction to the effect that defendant's statements in allocution "cannot be used in finding a mitigating factor." The trial court rejected the prosecutor's request, saying:

I'm certain that such a charge might undercut, in the Supreme Court's view, the value of allocution. Therefore, I have decided and I hold that I will only deal with

it indirectly insofar as I tell them what evidence is; namely, sworn testimony which comes from the witness stand or exhibits in evidence.

In the trial court's charge to the jurors before they retired to deliberate, the court made no direct reference to defendant's allocution. It did again remind the jury that their decision should be based only on testimony, only on evidence.

You must decide these matters of fact, the weight of testimony of each witness, the credibility of each witness, the inferences to be drawn from a witness' testimony and the ultimate conclusions about punishment to be reached upon all the facts.

. . . .

Your decision as to the facts must be based solely and exclusively on the evidence presented during the trial. That means the testimony, the sworn testimony of witnesses and such physical exhibits as have come into evidence.

. . . .

[A reasonable doubt] may arise from evidence or from a lack of evidence. The evidence to be considered by you includes that material presented by both sides at this trial; all of the witnesses, any testimony read and all the physical exhibits.

. . . .

You must decide the case on the evidence.

The trial court made clear to counsel (outside the hearing of the jury) its reasons for not charging the jury with respect to the allocution. It did not believe that the jury should be allowed to consider defendant's allocution in support of any mitigating factor. It reasoned that "allocution is not testimony, thus it's not evidence," and the jury may consider only evidence, thus the jury may not consider the defendant's allocution. As a consequence of that reasoning, it instructed counsel for both sides not to comment on defendant's statements made in allocution.

The majority concedes that the trial court erred. Because "defendant sought to prove his remorse as a specific mitigating factor, ... the jury may consider his allocution statement in determining whether he is, in fact, remorseful, or whether the defense has established any other mitigating factor." *Ante* at 479, 645 *A.*2d at 757. Further, the Court acknowledges "[b]ecause a

jury may consider defendant's statement in allocution insofar as it affects any mitigating factors presented," the trial court should have instructed the jury as such. *Ante* at 479, 645 *A.2d* at 757. *See* Capital Causes Committee, *Bench Manual* J(2)–40 ("If the defendant exercises his right to allocution, the judge should instruct the jury that it may consider what the defendant stated insofar as it impacts on one or more of the mitigating factors."). Nevertheless, the Court concludes that the error was harmless, and because, the right of allocution is not "constitutional in dimension," the failed instruction was not " 'clearly capable of producing an unjust result'." *Ante* at 480, 645 *A.2d* at 758. I strongly disagree.

Allocution refers to the right of a criminal defendant to deliver an unsworn statement to the jury. This Court has held that such statements should be limited in scope to allow a jury to consider that defendant's are " 'individual[s] capable of feeling and expressing remorse and of demonstrating some measure of hope for the future * * *.' " *State v. Zola*, 112 *N.J.* 384, 430, 548 *A.2d* 1022 (1988), *cert. denied*, 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L.Ed.*2d 205 (1989) (quoting J. Thomas Sullivan, *The Capital Defendant's Right to Make a Personal Plea for Mercy: Common Law Allocution and Constitutional Mitigation*, 15 *N.M.L.Rev.* 41, 41 (1985)). Although "the right of allocution [is] not in itself a constitutional right," *id.* at 429, 548 *A.2d* 1022, the Court has held that it is a common-law right of the criminal defendant. *Id.* at 428, 431–32, 548 *A.2d* 1022. "[W]hatever the Constitution permits," this Court remarked in *Zola*, "it bespeaks our common humanity that a defendant not be sentenced to death by a jury 'which never heard the sound of his voice.' " 112 *N.J.* at 429–30, 548 *A.2d* 1022 (quoting *McGautha v. California, supra*, 402 *U.S.* 183, 220, 91 *S.Ct.* 1454, 1474, 28 *L.Ed.*2d 711, 733 (1971)). At the same time, the Court made clear that there must be limitations on what a defendant can say, holding: "He would not be permitted to rebut any facts in evidence, to deny his guilt, or indeed, to voice an expression of remorse that contradicts evidentiary facts." *Id.* at 430, 548 *A.2d* 1022.

Thus, a defendant's allocution is not testimony in the normal sense but is nonetheless relevant to the jury as they make determinations with regard to mitigating factors and ultimately their overall determination. The majority, as noted, fully acknowledges the propriety of such an instruction. However, it gravely underestimates the *need* for such an instruction.

The need for such an instruction is obvious. That need, however, becomes acute when *other instructions create an impression that the jury cannot consider the defendant's statements. See Booth v. State*, 327 *Md.* 142, 608 *A.*2d 162, 180, *cert. denied,* ── *U.S.* ──, 113 *S.Ct.* 500, 121 *L.Ed.*2d 437 (1992). Here, the trial court never directly told the jury they could not consider defendant's allocution, rejecting such a limiting instruction for fear it would be error. Nevertheless, an attentive and discerning juror could have thought that was the court's view. The trial court told the jury they could consider only testimony, and, that defendant's statement was not testimony. The only logical conclusion a conscientious juror could draw was that the jury could not consider defendant's allocution.

The rulings of the trial court and the limited presentation to the jury created the distinct risk that the jury would not consider defendant's allocution as a circumstance bearing on mitigation. To cure that risk, which arose because of the trial court's repeated emphasis on "evidence" and "testimony," the court should have pointedly and directly instructed the jury that it could consider defendant's statement in allocution. Given that context, I find it difficult to conclude that such omission is harmless.

The Court's analysis on this point is unconvincing and indicative of the futility of applying conventional harmless-error analysis to penalty-trial proceedings. In finding the error harmless, the Court states:

> The failure to give instructions did not in any way prohibit the jury from considering defendant's allocution statement as an indication of his remorse, which is the only mitigating factor it could have affected. Although the court advised the jury that the evidence it could consider in its deliberations consisted of sworn testimony and exhibits, later in the charge the trial court made clear that that

evidence included all "material" presented by both sides at this trial. The court also advised the jury that the mitigating factors listed on the verdict sheet were non-exclusive. Moreover, continued remorse for the victim was listed in the verdict sheet as a mitigating factor. Still, eleven jurors did not find that mitigating factor.

[*Ante* at 480, 645 *A*.2d at 758.]

The problematic nature of the Court's analysis is self-evident. The Court's harmless-error determination is driven by the unwarranted assumption that the jury understood the proper relationship between defendant's allocution and the finding of the "remorse" mitigating factor. Nothing supports that assumption. The Court relies on the fact that eleven jurors rejected the "remorse" factors as support for the proposition that the failure to properly instruct this jury was harmless error. But those eleven jurors made their determination without proper instruction. The fact remains the Court cannot predict the likely effects the failure to instruct may have had on the jury.

In *State v. Marko Bey*, 137 *N.J.* 334, 397, 645 *A*.2d 685, 716 (1994) (Handler, J., dissenting), I argued that harmless error analysis in a penalty trial of a capital case was inappropriate. *Id.* at 415, 645 *A*.2d at 725. At the penalty-trial of a capital case, jurors are engaged in a delicate process of identifying and weighing several factors. It is virtually impossible to reconstruct that process after it has been completed. Therefore " 'predicting the reaction of the sentencer ... on the basis of a cold record is a dangerously speculative enterprise'." *Id.* at 416, 645 *A*.2d at 725 (quoting *Satterwhite v. Texas*, 486 *U.S.* 249, 261, 108 *S.Ct.* 1792, 1800, 100 *L.Ed.*2d 284, 297 (1988)). The Court's ruling with respect to defendant's allocution is a telling example of that point.

Here the Court relies on its assumption that the jury understood the relevance of defendant's allocution. The Court simply has no basis, and no right, to make such an assertion.

Further, the trial court ruled that neither party could comment on defendant's allocution. Indeed, the court threatened that if defense counsel did argue to the jury that defendant's unsworn statements supported the present remorse mitigating factor, then

the court would specifically instruct the jury that it could not consider defendant's statement in allocution.

The trial court's ruling on comments during summation shared the same premise as it's jury-instruction ruling—allocution is not evidence, juries can consider only evidence, therefore juries cannot consider allocution. Thus, not only was the absence of a jury instruction that the jury could consider the allocution error, but so was the court's ruling that counsel could not comment on the allocution.

The harmfulness of the errors and their clear capacity to produce an unjust result are essentially the same—both deprived the jury of the opportunity to consider the strongest available information in support of one of defendant's mitigating factors. The Court is surely wrong when it traduces defendant's simple effort, however feeble, to express his remorse to the persons who hold his fate in their hands.

### III

Defendant contends that he pleaded guilty because he was assured by counsel that he would not be sentenced to death. He challenges his guilty plea on two bases. First, he asserts, his plea was not knowing and voluntary because, in light of his reliance on his attorney's predictions, he did not understand its consequences, chiefly that he might actually receive the death penalty. Defendant also contends that he was denied effective assistance of counsel because of his attorney's erroneous and misleading advice.

The trial court determined that when defendant entered his guilty plea to capital murder, he understood that he could receive the death penalty. The court's determination was based on the following findings: (1) DeLuca testified that he had never told DiFrisco that he absolutely would not receive the death penalty; (2) although DeLuca did testify that he had told DiFrisco that he "never thought for a second" that Judge Dios would impose the death penalty, that view was expressed as an opinion, not a promise or guarantee; (3) defendant signed forms and acknowl-

edged in open court that he understood he could receive the death penalty; (4) the defendant admitted that third parties had told him, albeit well before the actual entry of the guilty plea, that death was a "realistic possibility;" and (5) defendant testified that he "got real nervous about pleading"—presumably that nervousness related to his fears about the possibility of receiving the death penalty if he did plead.

We have recognized that "[t]he touchstone of any guilty plea is that it is voluntarily made by the defendant with an understanding of the nature of the charge as well as the consequences of the plea, and that there is a factual basis to support the plea of guilty for the crime or crimes." *State v. Warren*, 115 *N.J.* 433, 442–43, 558 *A.*2d 1312 (1989). The majority rests assured that defendant did not misunderstand those consequences, namely, the possibility that he would receive the death sentence. *Ante* at 454, 645 *A.*2d at 744.

The Court fails to recognize the crucial factor in assessing both the voluntariness of defendant's plea and the effectiveness of defendant's counsel: defendant's attorney offered his client erroneous advice regarding the consequences of a guilty plea and allowed his client to rely on that advice although he had no prior experience in death-penalty litigation and had not undertaken a proper investigation. Moreover, the majority's analysis is premised on a need for finality and administrative convenience that is wholly inappropriate to adjudication in a capital context.

The Court accepts the State's argument that at most defendant was relying on mistaken opinion, not mistaken fact, regarding the consequences of his guilty plea. Yet, it is not at all clear that the opinion expressed by DiFrisco's attorney was not a mistake of fact or was not understood as a promise or assurance. The attorney believed, and effectively assumed, as a matter of fact, that there was a very small chance that his client would be sentenced to death if he pled guilty. The truth of the matter was that the attorney had no basis for making *any* prediction to his client,

especially one that was so critical to his client's decision to enter a plea.

The rationale for treating mistaken predictions differently from mistakes of fact or law is grounded in concerns about finality.

> In exercising its discretion the court must fairly and justly weigh the policy considerations which favor the finality of judicial procedures against the policy considerations which dictate that no man be deprived of his life or liberty except upon conviction after a fair trial or after the entry of a plea of guilty or its equivalent under circumstances which evidence that it was made truthfully, voluntarily and understandingly.
>
> [*State v. Deutsch*, 34 *N.J.* 190, 197–98, 168 *A.*2d 12 (1961).]

*See also State v. Taylor,* 80 *N.J.* 353, 362, 403 *A.*2d 889 (1979) (holding that defendant's "claim to be relieved of . . . consequences [of guilty plea] must be weighed against the strong interests of the State in its finality"); *Little v. Allsbrook,* 731 *F.*2d 238, 242 (4th Cir.1984) (allowing withdrawal of pleas whenever defense attorneys seriously underestimated sentences their clients received "would seriously undermine the finality of judgments entered pursuant to plea bargains").

In the context of a capital prosecution, however, concerns about the finality of judicial judgments must be balanced against the categorical finality of the death penalty. *See State v. Davis,* 116 *N.J.* 341, 355, 561 *A.*2d 1082 (1989) (recognizing that "finality" of capital cases elevates fairness concerns to "categorical imperative"). Moreover, concerns about abuse of such an exception that would allow the withdrawal of guilty pleas are exaggerated. Existing ethical restrictions would deter defense attorneys in capital cases from automatically predicting death sentences for their clients just to create grounds for withdrawing a guilty plea later. See A.B.A., *Standards for Criminal Justice* Standard 4–5.1(b) (1980).

We have stated that "[i]f a defendant is misinformed about his or her eligibility for the death sentence, and if that misunderstanding is material to the plea, he or she cannot be deemed to have entered a guilty plea with a full understanding of the penal consequences." *State v. Kiett,* 121 *N.J.* 483, 489, 582 *A.*2d 630

(1990). Thus, a guilty plea can be withdrawn when a defendant shows that the plea resulted from defense counsel's mistake of law or fact. *Ibid.* Although pleas based on defense counsel's "bad guesses" about sentencing generally ought not to justify the withdrawal of a guilty plea, in a capital context, allowing guilty pleas to be withdrawn when defense counsel mistakenly assures a capital defendant that he or she will most likely not receive the death penalty is necessary to ensure that due process values essential to the constitutional imposition of a death sentence are achieved.

On this record, I conclude that defendant has shown that he did not understand that a realistic and substantial possibility existed that he would receive a death sentence as a consequence of pleading guilty, and that his lack of understanding was a material factor in his decision to plead. *See Kiett, supra,* 121 *N.J.* at 489, 582 *A.*2d 630.

Similar considerations should guide the Court when it considers defendant's claim of ineffectiveness of counsel as a basis for withdrawing his guilty plea.

In *Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984), the United States Supreme Court adopted a two-step analysis for determining when a criminal defendant was denied the Sixth Amendment right to counsel on account of ineffective assistance of defendant's counsel. The defendant must first show that defendant's counsel performed deficiently. The defendant must then show that the counsel's deficient performance prejudiced the defense. *Id.* at 687, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693. The Supreme Court has also held "that the two-part *Strickland v. Washington* test applies to challenges of guilty pleas based on [ineffective assistance of counsel]." *Hill v. Lockhart,* 474 *U.S.* 52, 58, 106 *S.Ct.* 366, 371, 88 *L.Ed.*2d 203, 210 (1985). To set aside a guilty plea based on those grounds, a defendant must show: (i) counsel's assistance was not "within the range of competence demanded of attorneys in criminal cases," *Tollett v. Henderson,* 411 *U.S.* 258, 266, 93 *S.Ct.* 1602, 1608, 36 *L.Ed.*2d 235,

243 (1973); and (ii) "that there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial." *Hill, supra,* 474 *U.S.* at 59, 106 *S.Ct.* at 370, 88 *L.Ed.*2d at 210. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Strickland, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698.

This Court has adopted the *Strickland* standard for determining ineffective assistance of counsel under the right to counsel provided in the New Jersey Constitution. *See State v. Fritz,* 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987). The majority points out that the Court has refused to adopt a more stringent standard for reviewing ineffective assistance of counsel in capital cases, citing *State v. Davis,* 116 *N.J.* 341, 356, 561 *A.*2d 1082 (1989). *Ante* at 457, 645 *A.*2d at 746.

The trial court concluded the attorney's performance was "reasonable considering all of the circumstances" under the first prong of the *Strickland/Fritz* test. It ruled that a legally-significant difference exists "between an erroneous prediction of sentence ... [a]nd an indication that it is ... a done deal." The trial court found that the defendant "understood that his lawyer had ... a very strong opinion, very firmly conveyed." Nevertheless, although "the defendant knew it was [only] an opinion," the trial court found that defendant relied on that prediction.

The majority accepts the trial court's conclusion that DeLuca's ultimate prediction that the trial court would not sentence his client to death was reasonable, although it was wrong. *Ante* at 458, 645 *A.*2d at 746. It contrasts this case with the relatively few decisions in which defendant did receive ineffective assistance of counsel based on the erroneous advice on sentencing questions. Those decisions allowed defendants to withdraw guilty pleas based on ineffective assistance of counsel claims because counsel either made mistakes of law resulting in a grossly misinformed defendant, *O'Tuel v. Osborne,* 706 *F.*2d 498, 500 (4th Cir.1983); *Strader v. Garrison,* 611 *F.*2d 61, 63–65 (4th Cir.1979); *Hammond v.*

*United States,* 528 *F.*2d 15, 18–19 (4th Cir.1975), or intentionally misled the defendant, *Napper;* *see A.B.A. Standard on Criminal Justice* Standard § 4–5.1(b) (1980). The Court fails to explain why DeLuca's insistence that a relatively slight possibility of a death sentence existed did not grossly misinform defendant.

There is virtually no indication that the attorney undertook any investigation of the likelihood of defendant receiving the death sentence. The trial court further found that DeLuca's "investigation was essentially limited to reviewing the discovery provided by the State, which was a substantial amount of discovery, listening to the New York police tape [defendant's confession], and interviewing the client." Nevertheless, the court concluded that defendant had not shown that "counsel failed to make a reasonable decision with respect to whether further investigation was necessary." Because the case against DiFrisco "was so overwhelming," according to the trial court, DeLuca had acted within the range of professional competence in limiting his trial preparation to review of the State's discovery and doing no additional independent investigation.

Clearly, defense counsel had a duty to make " 'reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' " *State v. Savage,* 120 *N.J.* 594, 618, 577 *A.*2d 455 (1990) (quoting *Strickland, supra,* 466 *U.S.* at 691, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695). Under that reasonableness standard, DeLuca should have done more to investigate the sentencing predilections of Judge Dios, and he could have consulted with experienced capital defense counsel. Minimally, he should have explained that he had little, indeed, almost nothing, to go on in suggesting that only a small possibility existed that he would receive the death sentence. The recklessness of his prediction without bases was sufficiently unreasonable to constitute deficient performance, particularly for an attorney representing a defendant accused of a capital crime. *See Davis, supra,* 116 *N.J.* at 356, 561 *A.*2d 1082 (noting that expectations of expertise are higher for capital defense counsel).

DeLuca's own testimony suggests that his performance falls short of the expectations that this Court has required of attorneys representing defendants eligible for the death penalty. *Davis, supra,* 116 *N.J.* at 356, 561 *A.*2d 1082 ("We expect capital defense counsel to have an expertise regarding the special considerations present in capital cases."). DeLuca had never before represented a capital defendant, had never tried a case before the judge before whom he was about to appear, but he nevertheless assured his client in strong terms that if his client pled guilty, he would not receive the death penalty. That bespeaks a brazenness and imprudence poorly suited for the delicate and serious task of capital defense representation.

The Court refuses to acknowledge that the *Strickland/Fritz* standard does not serve to address the heightened concern for fairness that must predominate in a capital proceeding. *Davis, supra,* 116 *N.J.* at 356, 561 *A.*2d 1082. I remain convinced of the wisdom of Justice Marshal, who dissenting in *Strickland,* stated:

> The importance of the process of counsel's efforts, combined with the severity and irrevocability of the sanction at stake, require that the standards for determining what constitutes "effective assistance" be applied especially stringently in capital proceedings.
>
> [466 *U.S.* at 715–16, 104 *S.Ct.* at 2079, 80 *L.Ed.*2d at 711–12.]

This case underscores the need to require counsel whose skills are commensurate to the herculean task of defending a person charged with capital murder.

Defendant contends further that whether the withdrawal of his guilty plea is based on his inadequate understanding of its consequences or on the ineffectiveness of counsel, he should be entitled to a new trial on the issue of innocence or guilt. The trial court, however, had concluded that all defendant would be entitled to was a new sentencing proceeding in front of a jury; moreover, because defendant has already received a new sentencing proceeding in front of a jury on other grounds, *Di Frisco* [I], *supra,* 118 *N.J.* 253, 571 *A.*2d 914, he is not entitled to any remedy at this point. Similarly, with respect to the "prejudice" prong of the *Strickland/Fritz* test of ineffectiveness of counsel, the trial court

concluded that defendant had not been prejudiced. The Court insisted that defendant had not demonstrated that there "a reasonable probability [existed] that the result of the guilt phase would have been different" if the attorney had rendered effective assistance. It disallowed any remedy for defendant, stating, "I don't see how it would have made any difference on the trial of guilt." The trial court's conclusion on the issue of remedy seems plainly wrong.

The standard set forth by the United States Supreme Court requires that the defense show only a reasonable probability that the defendant would not have pled guilty. *Hill, supra,* 474 *U.S.* at 59, 106 *S.Ct.* at 370, 88 *L.Ed.*2d at 210. The trial court's emphasis on the evidence of defendant's guilt was misplaced. The right to trial by jury, which is what defendant is arguing he has been denied, does not require a predicate showing of innocence. *See State v. Ingenito,* 87 *N.J.* 204, 211–12, 432 *A.*2d 912 (1981).

In this case, the testimony of DiFrisco and DeLuca directly supports the defendant's argument. DiFrisco said he "[a]bsolutely" would not have pled guilty, instead he would have "[gone] with the jury." Similarly, DeLuca testified that if any question had existed that defendant would not receive a life sentence, he "would have tried the case" because DiFrisco "had nothing to lose."

In sum, the circumstances surrounding defense counsel's advice to defendant approximate gross negligence and constitute deficient performance. Further, the evidence satisfies the prejudice prong of the *Strickland/Fritz* standard. The record supports only one conclusion—a reasonable probability exists that if DeLuca had not strongly advised DiFrisco that Judge Dios was not likely to impose a death sentence, then DiFrisco would not have pled guilty. No evidence directly contradicts that claim.

## IV

The majority suggests that the trial court did not err in failing to excuse prospective juror Leslie Dawson for cause, thus requiring defendant to expend a peremptory challenge unnecessarily.

*Ante* at 466, 645 *A*.2d at 751. It nevertheless concludes that any putative error in that regard was harmless. I believe that the trial court did err in failing to excuse Juror Dawson and further that the error could not be considered harmless under the criteria adopted by the Court. In assessing the prejudicial capacity of the trial court's error, the majority imposes a nearly impossible burden on the defendant. Because I am convinced that the majority's conclusion is inconsistent with the heightened due process concerns that attend a capital trial, I am impelled to express my disagreement with the reasoning of the majority.

In its attempt to settle what has been an open question, see *State v. Williams,* 113 *N.J.* 393, 445, 550 *A*.2d 1172 (1988) ("We need not decide whether the loss of a peremptory challenge * * * where all peremptories were ultimately exhausted would, by itself, warrant reversal."), the majority adopts a juror-bias rule where the defendant must demonstrate that because of the error and the defendant's consequent exhaustion of peremptories, a partial juror eventually was seated. *Ante* at 468, 645 *A*.2d at 752. In adopting this position, the majority mis-perceives the unique function of a peremptory challenge.

In my view, the purpose of peremptory challenges is to enable the parties to participate in jury selection and thereby bring to bear their own perceptions of the kind of jurors who are especially qualified or unqualified to determine the issues in the case being tried. *See Williams, supra,* 113 *N.J.* at 463–64, 550 *A*.2d 1172. Peremptory challenges are critical not only to reinforce participation values, but also because they bring the truth-seeking advantages of the adversarial system to bear in jury selection.

The majority notes the harmful effects likely to result from the unnecessary use of a peremptory challenge. *Ante* at 472, 645 *A*.2d at 754. It further acknowledges that the trial court "would have been obliged to be receptive" to defense counsel's request for additional peremptories. *Ante* at 472, 645 *A*.2d at 754. It nevertheless proceeds to impose a nearly impossible burden on defendants who have exhausted peremptory challenges because of

improvident trial court rulings. Under the majority's rule, a defendant must show (1) that the trial court erred by failing to remove a juror for cause; (2) that the juror in question was eliminated by the exercise of defendant's peremptory challenges, which were subsequently exhausted; and (3) that at least one of the jurors who eventually sat on the jury was a partial juror. *Ante* at 471, 645 *A.*2d at 753.

The majority's rule is overly formalistic and reduces the role of peremptory challenges to that of a mere supplement to the trial court's responsibility to ensure an impartial jury. *Williams, supra,* 113 *N.J.* at 468, 550 *A.*2d 1172. It makes peremptory challenges into a "safety net" for imprudent trial court decisions on juror exclusion. *Ibid.* I remain convinced that this is error. "[W]here an erroneous denial of a challenge for cause prompts a defendant to dismiss a juror peremptorily, and the defendant ultimately exhausts his supply of peremptory challenges prior to the completion of jury selection and is denied an additional peremptory challenge state constitutional standards of due process and fundamental fairness compel a reversal." *Id.* at 471, 550 *A.*2d 1172.

V

The greatest failure in this case is the Court's refusal to acknowledge and correct the extraordinarily prejudicial course of events that may have deprived defendant of a non-unanimous, life verdict. Based on a pure guess as to what the jury meant by its verdict, the Court, astonishingly, approves a death sentence. That grave shortcoming is compounded by the Court's patent unfairness in truncating defendant's slender but singular right to seek mitigation through allocution, and its sterile consideration of the peculiar infirmities that undermine the validity of defendant's guilty plea.

The Court's evident inability to recognize the serious prejudicial capacity of those errors underscores the basic impossibility of a fair and humane administration of a capital punishment. Like

former Supreme Court Justice Lewis F. Powell, Jr., I am convinced that our continued attempts to administer capital punishment, have the inevitable effect of bringing the whole edifice of the law into disrepute. *See* John C. Jeffries, Jr., *JUSTICE LEWIS F. POWELL, JR.,* 452 (1994).

Today's decision exemplifies the baleful influence capital punishment exerts on the Court's jurisprudence and work-product. Loath to reverse defendant's death sentence again, see *Di Frisco, supra,* 118 *N.J.* 253, 571 *A.*2d 914 the Court engages in a perfunctory analysis that in no way measures up to the rigorous demands for securing justice in a capital case. Its uncritical treatment of life-and-death issues deprives its opinion of the persuasive authority to which this Court has become accustomed. Sadly, in the face of significant doubt, it leaves a defendant under the sentence of death.

Justices CLIFFORD and STEIN join in Part I of this opinion. They would vacate the death sentence and remand to the trial court for the imposition of a life sentence.

*For affirmance*—Chief Justice WILENTZ, and Justices POLLOCK, O'HERN and GARIBALDI—4.

*For reversal and remandment*—Justices CLIFFORD, HANDLER and STEIN—3.